SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
DAVID A. SCHWARZ, Cal Bar No. 159376
dschwarz@sheppardmullin.com
BARBARA E. TAYLOR, Cal Bar No. 166374
btaylor@sheppardmullin.com
KRISTA L. LANDIS, Cal. Bar No. 348262
klandis@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

BARSAMIAN & MOODY
  A Professional Corporation
PATRICK MOODY, Cal Bar No. 156928
pmoody@theemployerslawfirm.com
1141 West Shaw Avenue, Suite 104
Fresno, California 93711
Telephone:  559.248.2360
Facsimile:   559.248.2370

Attorneys for Western Growers Association
and Olive Hill Greenhouses, Inc.

## U.S. DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN GROWERS ASSOCIATION and OLIVE HILL GREENHOUSES, INC, <br><br> Plaintiffs, <br><br> v. <br><br> AGRICULTURAL LABOR RELATIONS BOARD; VICTORIA HASSID in her official capacity as Chairperson of the California Agricultural Labor Relations Board; ISADORE HALL III, BARRY BROAD,  RALPH LIGHTSTONE, and CINTHIA N. FLORES, in their official capacities as Members of the California Agricultural Labor Relations Board; SANTIAGO AVILA-GOMEZ, in his official capacity as Executive Secretary of the California Agricultural Labor Relations Board; and DOES 1 through 100 inclusive, <br><br> Defendants. | Case No.  **'25CV0815 CAB BLM** <br><br> **VERIFIED COMPLAINT FOR:** <br><br> **(1) VIOLATION OF DUE PROCESS** [U.S. Const., amends. V, XIV; 42 U.S.C. § 1983 and § 1988]; <br><br> **(2) VIOLATION OF EQUAL PROTECTION** [U.S. Const., amend. XIV; 42 U.S.C. § 1983 and § 1988]; <br><br> **(3) DECLARATORY AND INJUNCTIVE RELIEF** [28 U.S.C. §§  2201, 2202] |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 4

II.   THE PARTIES ................................................................. 11

III.  JURISDICTION AND VENUE ................................................. 16

IV.   THE MMC STATUTORY SCHEME ............................................ 16

V.    PROCEDURAL BACKGROUND ............................................... 21

      A.    The Majority Support Petition ("MSP") Certification ................. 21

      B.    The MMC Process Has Begun ......................................... 21

VI.   THE LEGAL AND PRACTICAL CONSEQUENCES OF MMC .................. 22

      A.    Compelled Association ............................................... 22

      B.    Freedom Of Labor ................................................... 25

      C.    Freedom Of Contract ................................................ 28

VII.  THE MERITS OF PLAINTIFFS' CONSTITUTIONAL CHALLENGES
      CAN AND SHOULD BE DECIDED NOW ....................................... 30

      A.    THERE ARE NO GROUNDS WHICH COULD SUPPORT
            ABSTENTION OR A STAY OF THIS ACTION ......................... 32

FIRST CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE
FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ...................... 36

      A.    California's Compulsory Arbitration Scheme Deprives Farm Owners
            Of Liberty And Property Without Due Process Of Law. ............... 37

      B.    The U.S. Supreme Court Has Already Concluded That Compulsory
            Arbitration Schemes Similar To California's MMC Statute Violate
            Due Process. ........................................................ 39

SECOND CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE
FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ...................... 44

      A.    MMC Violates Due Process By Depriving The Employer With No
            Exit From Compulsory Arbitration Or Any Safeguards To Secure A
            Reasonable Rate Of Return. .......................................... 44

THIRD CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE
FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ...................... 47

      A.    The MMC Statute's Delegation Of Coercive State Power To A
            Private, Self-Interested Union Violates Due Process Of Law. ......... 47

FOURTH CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ...................... 52

    A.    MMC Impermissibly Combines "Mediation" And "Adjudication" Functions In One Decision-Maker. ............................................... 53

    B.    The MMC Statute Precludes Admissibility Or Judicial Review Of "Off-The-Record" Or *Ex Parte* Mediation Communications. ...................... 55

FIFTH CAUSE OF ACTION VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ........ 57

    A.    The MMC Statute Violates Due Process By Requiring "Parties" To Bear Half The Costs Of A Compelled Contracting Process. ...................... 57

SIXTH CAUSE OF ACTION VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION ....................................................................................... 60

    A.    The MMC Statute Violates Equal Protection By Empowering A Self-Interested Union To Compel Individualized And Arbitrary Distinctions By The State Among Similarly Situated Employers. .............. 60

SEVENTH CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF ........................................................................................................ 66

PRAYER FOR RELIEF ................................................................................... 67

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Western Growers Association ("Western Growers" or "WGA") and Olive Hill Greenhouses, Inc. ("Olive Hill") (collectively, "Plaintiffs") allege in this verified complaint for declaratory and injunctive relief, and for nominal damages, based on violations of Plaintiffs' constitutional and civil rights under 42 U.S.C. §§ 1983 and the Fourteenth Amendment to the United States Constitution, by Defendants California Agricultural Labor Relations Board and each of its members in their official capacity, as follows:

## I.   INTRODUCTION

1.      The question presented in this constitutional challenge is whether Defendant California Agricultural Labor Relations Board (the "Board") may dictate, at the behest of a union, every term of *one* employer's labor-management relationship – wages to be paid for each job classification, seniority rights, grievance procedures, and so forth – via a compulsory arbitration process known as "mandatory mediation and conciliation," under the California Agricultural Labor Relations Act ("ALRA"), Labor Code ("Lab. Code") § 1164 *et seq*. (the "MMC Statute"). Unlike laws of general application, such as minimum wage or maximum hours requirements, the "contract" imposed by the Board goes no further than to bind one employer to a bespoke set of employment terms and conditions, without assuring any congruence with other MMC "contracts" imposed on similarly situated employers. By operation of law, this "contract" bars farmworkers from petitioning the Board for a decertification election during the term of this "agreement," thereby entrenching the union which initiated this forced contracting process. This constitutionally indefensible treatment of farmers and farmworkers infringes upon the liberty and property interests and associational rights of an individual employer and its employees and violates the Due Process and Equal Protection Clauses of the U.S. Constitution.

2.      Outside of times of war or other national emergencies where continuity of private business operations is in the vital public interest, the Constitution does not

permit a state to force one employer to accept specific contract terms against its will simply because it is the government's preferred labor policy. MMC imposes terms and conditions applicable to only one employer and one workplace, while denying the employer its right to resist state-compelled contract concessions, and without any requirement that similar terms and conditions be applied to similarly situated competitors. This is the very antithesis of equal protection, because each imposed "agreement" will be its own set of rules applicable to one employer and its employees, but not to others in the same legislative classification.

3.    In three related cases that are a foundation of modern labor law, the U.S. Supreme Court unanimously struck down a Kansas compulsory arbitration scheme closely analogous to MMC because it infringed on the liberty and property interests of private employers and employees without due process of law and violated the employees' freedom of association. *See Wolff Packing Co.* v. *Indus. Court* (*Wolff I*), 262 U.S. 522 (1923); *Dorchy* v. *Kansas*, 264 U.S. 286 (1924) (*Dorchy I*); *Wolff Packing Co.* v. *Indus. Court*, 267 U.S. 552 (1925) (*Wolff II*) (collectively, "*Wolff Packing*" or the "*Wolff* trilogy"); *see also Dorchy* v. *Kansas*, 272 U.S. 306, 307 (1926) (*Dorchy II*) (recognizing the qualified constitutional right to strike). *Wolff Packing* laid the foundation for the two constitutional premises of modern labor law, both of which are violated by the MMC Statute: the freedom of association in the workers' choice of bargaining representative, *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937), and "freedom of contract, . . . without any official compulsion over the actual terms of the contract." *H.K. Porter Co., Inc.* v. *NLRB*, 397 U.S. 99, 105, 108 (1970) (citing *Jones & Laughlin*, 301 U.S. at 45). *Wolff Packing* established the constitutional dividing line between mandatory

collective bargaining and compulsory imposition of terms which has guided American labor law ever since.[1]

4.  Thus, when the Supreme Court stated in *Wolff Packing* that the Kansas Act compelled a worker "to give up that means of putting himself on an equality with his employer which action in concert with his fellows gives him," *Wolff I,* 262 U.S. at 540, it recognized that true "freedom of contract" was illusory so long as workers were not allowed to engage in their constitutionally protected rights of free speech, association, and collective action (including the right to strike) necessary to obtain bargaining equality. The workers' "fundamental right" to engage in collective action, *Jones & Laughlin*, 301 U.S. at 33, along with the employer's right not to be compelled to make contract concessions or to be forced to agree to contract terms, is the constitutional premise upon which the NLRA rests.[2]

5.  *Wolff Packing* has never been overruled or even questioned by the Supreme Court, or by any state court – except one. In *Gerawan Farming, Inc.* v. *ALRB*, 3 Cal.5th 1118 (2017) (*Gerawan I*), *cert. denied*, 139 S. Ct. 60 (2018), the California Supreme Court upheld the MMC Statute against a due process and equal protection challenge, dismissing *Wolff Packing* as a "completely repudiated" relic of the *Lochner* era. This would come as a surprise to the Court's most vociferous contemporary critics of *Lochner,* Justices Holmes and Brandeis. Both Justices

---

[1] *See, e.g.*, *Jones & Laughlin*, 301 U.S. at 45 (U.S. labor law "does not compel agreements between employers and employees," and "does not compel any agreement whatever"); *Associated Press* v. *NLRB*, 301 U.S. 103, 120 (1937) (upholding NLRA against due process challenge because statute "does not fix wages or hours, or provide for compulsory arbitration of labor disputes"); *Virginian Ry. Co.* v. *Ry. Employees*, 300 U.S. 515, 543, 548 (1937) (upholding constitutionality of amendments to the Railway Labor Act based on the distinction between the "voluntary submission to arbitration" and compelled agreements between employer and employees).

[2] Although Congress excluded agricultural laborers from the protections of the NLRA, 29 U.S.C. § 152(3), the ALRA expressly states that the ALRB "shall follow applicable precedents of the NLRA." *See* Lab. Code § 1148.

Holmes and Brandeis joined the unanimous decisions in *Wolff Packing,* with Justice Brandeis writing the opinion of the Court in *Dorchy I.*

6.    The California Supreme Court did not dispute that the State's compulsory arbitration scheme implicates significant liberty and property interests. Nor did it attempt to distinguish MMC from the forced contracting scheme invalidated in *Wolff Packing,* even though the similarities are too obvious to ignore. While labelling *Wolff Packing* a "*Lochner* era relic" is a disingenuous way to avoid any discussion of the actual holdings, it is not a substitute for analysis. *Cf.* L. Tribe, *American Constitutional Law* 435 (1978), cited in *Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1630 (2018) ("'*Lochnerizing*' has become so much an epithet that the very use of the label may obscure attempts at understanding.").

7.    *First*, dismissing *Wolff Packing* as a "*Lochner* era relic" ignores the distinction between the New Deal Court's repudiation of a substantive due process right to be free from **general** minimum wage and maximum hour legislation and the actual holdings in *Wolff Packing*, which struck down Kansas's **particularized** efforts to restrict the rights of **one employer** and its employees through selective and procedurally unfair unilateral fiat. *Second*, the *Lochner* era cases regulated hours, pay, and working conditions – not speech, association, or the right to organize or strike, fundamental individual rights that were abridged by the "system of compulsory arbitration" condemned in *Wolff Packing*. *Third*, the core holding of *Wolff* is that the state's system of joint compulsion violates <u>both</u> the "freedom of labor" and the "freedom of contract." *Wolff I,* 262 U.S. at 534, 542. "Without this joint compulsion, the whole theory and purpose of the act would fail." *Wolff II*, 267 U.S. at 568. As *Wolff I* explained, the statute "shows very plainly that its purpose is not to regulate wages or hours of labor either generally or in particular classes of businesses," *id.* at 565, but "is intended to compel . . . the owner and employees to continue the business on terms which are not of their making." *Id*. at 569.

8.    This Court has an obligation to decide whether a state law violates the U.S. Constitution, regardless of any pronouncement by the California Supreme Court. *See Moore* v. *Harper*, 600 U.S. 1, 34, 35 (2023). When a state court flouts the U.S. Supreme Court's holdings, judicial review is essential to maintain uniformity of federal law. The proper practice is for lower courts to "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas* v. *Shearson/Am. Express, Inc*., 490 U.S. 477, 484 (1989).

9.    Even so, the California Supreme Court avoided other constitutionally problematic aspects of the MMC Statute. *First*, the MMC Statute violates due process in the most classical sense of that term, because it denies the employer and its employees <u>existing</u> constitutional rights, not by general law but by arbitrary fiat. Neither employers nor their employees agree to compulsory arbitration as a "bargained-for" exchange. While states may deprive citizens of liberty and property through due process of law, they may not do so "through arbitrary coercion." *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 587 (1996) (Breyer, J., concurring).

10.    *Second*, the Due Process Clause prohibits the delegation of the State's coercive power to private, self-interested actors without any means to safeguard against the arbitrary exercise of that power. Under the MMC Statute, the union dictates whether, when, and which employer it will force into compulsory arbitration, "'uncontrolled by any standard or rule prescribed by legislative action,'" *General Elec.* v. *N.Y. State Dept of Labor*, 936 F.2d 1448, 1454-55 (2d Cir. 1991) (*General Elec.*) (collecting cases and quoting *Seattle Trust Co.* v. *Roberge*, 278 U.S. 116, 122 (1928) (*Roberge*)), and without any residual check to prevent the misuse of that power for personal gain, private bias, or mere "'caprice.'" *Id.* at 1455. The MMC Statute allows the ALRB *no* discretion in determining whether to compel an employer into MMC. "To put it in the words of the constitutional guarantee, when private parties have the unrestrained ability to decide whether another citizen's

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

property rights can be restricted, any resulting deprivation happens without 'process of law.'" *Boerschig* v. *Pipeline*, 872 F.3d 701, 708 (5th Cir. 2017).

11.    *Third*, once directed into MMC, the forced contracting machinery grinds inexorably to the imposition of a government-drafted contract, regardless of the employer's participation in the process. The employer has no right to opt-out or to exit, and no *ex ante* mechanism to ensure the employer can obtain a fair and reasonable return, let alone avoid operating at a loss should the economic "contract" terms dictated by the State turn confiscatory. Even the threat of resort to compulsory interest arbitration is coercive in nature, since it enables an interested party (a union) to exert pressure on an employer to either make bargaining concessions or to have the contract terms imposed by force of law. *Cf. Arnett* v. *Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) ("[T]he value of a sword of Damocles is that it hangs — not that it drops.").

12.    *Fourth*, MMC requires the employer to submit to a hybrid mediation/ arbitration process in which confidential, "off-the-record" mediation discussions **and** the "on-the-record" arbitration phase are presided over by the ***same*** decision-maker. This coercive, hybrid process violates due process because it combines "mediation" and "adjudication" functions in one person. It also highlights the risk that the terms imposed will be based on the subjective leanings of each mediator, particularly as there is no objective standard upon which the mediator must base his determinations, whether standing alone or in comparison to other CBAs.

13.    The facts here illustrate the need for judicial resolution of the constitutionality of MMC. Olive Hill was thrust into MMC after the United Farmworkers of America ("UFW") was certified as the exclusive bargaining representative of Olive Hill's agricultural laborers pursuant to the ALRA's newly enacted "Majority Support Petition ("MSP") Election" procedures, also known as "Card Check." *See* Lab. Code § 1156.37 *et seq*. (the "MSP Statute"). This is not an "election" in any accepted sense of the word. Card Check allows a union to, in

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

essence, "self-certify" by submitting authorization cards purportedly signed by a majority of the employees in the bargaining unit, albeit without any mechanism to allow the employer (or the Board) to verify the authenticity of individual card signatures or the circumstances surrounding their solicitation.

14.     In *Gerawan I,* the California Supreme Court upheld the MMC Statute in part based on the availability of a secret ballot election *before* an MMC contract would be imposed. *Gerawan I*, 3 Cal.5th at 1158 (citation and quotation omitted) ("So long as the employees can petition for a new election if they wish to remove the union, the employer has no real cause for concern about whether it is bargaining with the true representative of its employees."). Card Check had not been enacted when the Court offered these assurances. Under the MSP Statute, a union may be certified, without any of the safeguards of a secret ballot election, without first considering objections as to the "proof" of majority support, and without the availability of a secret ballot election before the MMC "contract" is imposed by final Board order.

15.     Although *Gerawan I* may be distinguishable because it was decided prior to Card Check's enactment, this is not a basis to avoid a determination of the facial constitutional defects of the MMC Statute, which exist independently from the lack of any adequate safeguards to assure majority rule. That determination may not be avoided by striking down a particular provision of the MMC Statute, or by excising a particular term of the MMC "agreement," where "[m]ost of the provisions of the [MMC Statute] are very intimately connected with the system of compulsory arbitration." *See Dorchy I*, 264 U.S. at 290. As with the scheme invalidated in *Wolff Packing*, California's system of compulsory arbitration *requires* the abridgement of the liberty and property interests of the employer *and* its employees, a point best illustrated by the fact that, on information and belief, every MMC "contract" dictated by the State requires the employer to fire any employee who refuses to surrender a portion of their paycheck to the union. "Without this joint

-10-

compulsion, the whole theory and purpose of the act would fail." *Wolff I*, 262 U.S. at 541.

## II.    THE PARTIES

16.    Plaintiff Olive Hill Greenhouses, Inc. is a California corporation with agricultural operations in Fallbrook, California, in San Diego County. Olive Hill Greenhouses specializes in growing indoor tropical plants like Bromeliads, Anthuriums, and foliage plants, which are ideal for interior plant scaping. Olive Hill sells its plants across Southern California, Arizona, Colorado, the Midwest, Pacific Northwest, Utah, and Texas.

17.    Olive Hill is a family operation. It began in Fallbrook in 1973, opened by husband-and-wife team, Tony and Sue Godfrey. Over the years, the business has grown into one of the largest interior plant producers in California. Olive Hill became a second-generation business in 2000, when Denise Godfrey, Tony and Sue's daughter, joined the business. Olive Hill is a member of WGA.

18.    Olive Hill's success depends on its ability to recruit, train, and motivate its most productive workers. High wages, good working conditions, attractive benefits, and open communications with management are integral to maintaining low employee turnover and consistently high quality. Despite the seasonal nature of most agricultural operations, Olive Hill's direct hire employees are employed full-time throughout the year. For decades, Olive Hill has paid employees above the minimum wage and offers numerous benefits in accordance with employee needs, such as an ACA-approved cross-border health plan, sick pay, bereavement pay, paid holidays, bonuses for production and non-production employees, as well as 401(k), Flexible Spending Accounts (FSA) and life insurance plans. There are no differences between the benefits extended to Olive Hill's agricultural employees and its management.

19.    The UFW was certified as the bargaining representative for Olive Hill's farmworkers on January 16, 2024. At that time, the company employed 79 full-time,

1  direct-hire agricultural employees. The certification was based on the UFW's

2  January 10, 2024 majority support petition, which was accompanied by

3  authorization cards allegedly signed by 47 Olive Hill agricultural employees. Olive

4  Hill did not pursue its right to object to the certification, choosing instead to

5  recognize and to diligently attempt to bargain with the UFW.

6      20.    On January 26, 2024, the UFW sent a letter requesting Olive Hill to

7  bargain over the terms of a CBA (Exhibit 1), thus triggering the 90-day period

8  before MMC may be demanded. *See* Lab. Code § 1164(a)(2). The UFW made its

9  first non-economic proposal nearly two months after it requested bargaining, on

10  March 20, 2024. The UFW never made any economic proposals until after the

11  Board ordered the parties to MMC on November 22, 2024.

12      21.    The parties conducted five bargaining sessions. The first took place on

13  March 26, 2024. The second took place on April 25, 2024. A third session took

14  place on July 10, 2024, and a fourth session on August 12, 2024. Progress was made

15  during these negotiations and tentative agreements were reached as to a number of

16  non-economic terms. A fifth bargaining session began on September 12, 2024, but

17  was terminated mid-session by the UFW, ostensibly to provide a counterproposal in

18  writing to Olive Hill's pending non-economic counterproposal. The UFW never sent

19  a counter nor suggested dates for further negotiations. The UFW agreed not to

20  invoke MMC if progress was being made through negotiations. Nonetheless, for

21  reasons never given, the next communication from the UFW was when Olive Hill

22  was served with a copy of the union's November 12, 2024 petition requesting the

23  Board refer the parties to MMC.

24      22.    The Board granted the UFW's petition on November 22, 2024 over

25  Olive Hill's objections. *See* ALRB Admin. Order No. 2024-28 (November 22,

26  2024) (Exhibit 2). The Board found that the petition satisfied "the statutory and

27  regulatory criteria for referral to MMC," i.e., (a) that the UFW is certified as the

28  exclusive bargaining representative of Olive Hill's agricultural employees, (b) it has

1    been over 90 days since the union's initial request to bargain, (c) the employer has

2    employed 25 or more agricultural employees during any calendar week in the

3    preceding year, and (d) the parties have not entered into a CBA. *See id*., at p. 4

4    (citing MMC Statute, § 1164(a)(2), and Regs., § 20400(b)).

5        23.    Plaintiff Western Growers Association ("WGA") is a nonprofit

6    association representing local and regional family farmers in California, Arizona,

7    Colorado and New Mexico for nearly a century. *See* https://www.wga.com. WGA

8    members grow, pack, and ship over half of the nation's fresh produce including

9    nearly a third of America's fresh organic produce. WGA member companies are

10   dedicated to providing a great variety of safe and healthy fresh fruits, vegetables and

11   tree nuts to consumers. With offices and dedicated staff in Sacramento, California

12   and Washington, D.C., WGA is a leading public policy advocate for the fresh

13   produce industry and has a longstanding interest in employment and labor matters.

14   WGA has filed amicus briefs in labor and employment cases raising matters of

15   significance to its members. *See, e.g., Cedar Point Nursery* v. *Hassid*, 141 S. Ct.

16   2063 (2021); *Gerawan Farming, Inc.* v. *Agric. Labor Relations Bd.*, 3 Cal. 5th 1118

17   (2017) (*Gerawan I*), *cert. denied*, 139 S.Ct. 60 (2018); *Hess Collection Winery* v.

18   *Agric. Labor Relations Bd.*, 140 Cal. App. 4th 1584 (2006); *S. G. Borello & Sons,*

19   *Inc.* v. *Dep't of Indus. Relations*, 48 Cal.3d 341 (1989). Two of these cases, *Hess*

20   *Collection Winery* and *Gerawan I*, involved state court challenges to the MMC

21   process.

22       24.    WGA's members have been targeted with MMC in the past (such as

23   D'Arrigo Bros. Co. of California, George Amaral Ranches, Inc, San Joaquin

24   Tomato Growers, Inc, Dole Berry North, and The DiMare Company), or are

25   currently being targeted by MMC (such as Olive Hill and Wonderful Nurseries

26   LLC), or expect to be targeted by MMC in the future, particularly in light of the ease

27   with which a union may obtain certification via Card Check. WGA therefore alleges

28   that MMC injures its members.

25.    "[A]n organization may have standing to assert the claims of its members even where it has suffered no direct injury from a challenged activity." *Columbia Basin Apartment Ass'n* v. *City of Pasco*, 268 F.3d 791, 798 (9th Cir. 2001). "To establish associational standing and bring suit on behalf of its members, [WGA] must establish that: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Stavrianoudakis* v. *U.S. Fish and Wildlife Service*, 108 F.4th 1128, 1143 (9th Cir. 2024), quoting *Cent. Sierra Env't Res. Ctr.* v. *Stanislaus Nat'l Forest*, 30 F.4th 929, 937 (9th Cir. 2022) (quoting *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

26.    Here, WGA members who have been subjected to MMC, including Olive Hill, clearly have standing to challenge the MMC Statute. Ensuring that its members—local and regional family farmers—are not subject to unconstitutional labor laws is "germane" to WGA's purpose. And although Olive Hill is a co-plaintiff, facial constitutional claims requesting declaratory and injunctive relief "'do not require individualized proof.'" *Stavrianoudakis,* 108 F.4th at 1143, quoting *Columbia Basin Apartment Ass'n*, 268 F.3d at 799. Thus, WGA has standing to challenge the constitutionality of the MMC Statute.

27.    Defendant California Agricultural Labor Relations Board ("ALRB" or "Board") is a state agency with its principal office at 1325 J Street, Suite 1900, Sacramento, California 95814-2944. The ALRB has statutory authority to order parties to MMC and to issue orders imposing CBA terms pursuant to California Labor Code § 1164 *et seq*. On November 22, 2024, the ALRB directed Olive Hill into MMC, at the request of the United Farm Workers of America ("UFW"), the labor organization certified on January 10, 2024, to represent Olive Hill's agricultural employees pursuant to the so-called MSP "election" procedures, Lab.

Code § 1156.37 *et seq*. Olive Hill is informed and believes, and on this basis alleges, that the UFW's principal office is at 29700 Woodford-Tehachapi Road, Keene, California 93531.

28.     Defendant Victoria Hassid is Chairperson of the ALRB. Defendants Isadore Hall III, Barry Broad, Ralph Lightstone, and Cinthia N. Flores are members of the ALRB. In their official capacities, each member of the Board is responsible for the exercise of statutory powers vested in the Board, *inter alia*, "to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, to determine whether a question of representation exists, to direct an election by a secret ballot pursuant to the provisions of Chapter 5 (commencing with section 1156), and to certify the results of such election, or to certify a labor organization pursuant to section 1156.37 and to investigate, conduct hearings and make determinations relating to unfair labor practices." *See* Lab. Code § 1142(b). The Board is also charged with the responsibility of overseeing the MMC process, and enforcing a final order of the Board imposing a MMC "contract."

29.     Defendant Santiago Avila-Gomez is Executive Secretary of the ALRB. The Executive Secretary is appointed by the Board, and has been delegated by the Board "such powers as it deems appropriate" to perform its statutory functions in connection with the administrative determinations, certification, and investigation of the MSP, and under the MMC Statute. (Lab. Code §§ 1142(b), 1145.) On behalf of the Board, Executive Secretary Avila-Gomez and issued and signed various orders pertinent to the conduct of the MMC proceedings at issue here.

30.     Each of these individuals is named in his or her official capacity as Board members, officers, or personnel of the ALRB.

31.     The true names and capacities of defendants DOES ONE through ONE HUNDRED are unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this Verified Complaint to allege such names and capacities as soon as they are ascertained.

### III.    JURISDICTION AND VENUE

32.    This case is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Fourteenth Amendment to the United States Constitution.

33.    The case presents a federal question within this Court's jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 and 1343.

34.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

35.    Venue is proper in this Court under 28 U.S.C. § 1391 because Olive Hill has its principal place of business in the County of San Diego, and because a substantial part of the events giving rise to this claim occurred in this District.

### IV.    THE MMC STATUTORY SCHEME

36.    MMC is a highly expedited, compulsory contracting process, whereby a Board-appointed "mediator" decides the terms of a collective bargaining agreement between the union and the employer, which then becomes an enforceable order of the Board. The terms of that "contract" are subject to limited, discretionary administrative review. By its own terms, the MMC contract may be imposed on an employer by a final Board order as soon as 60 to 90 days after the parties are directed into the process.

37.    Under Labor Code section 1164 *et seq.*, a certified labor union may file a declaration with the Board stating that the parties have not been able to reach an agreement and requesting that the Board order the parties to "mandatory mediation and conciliation" of their issues. The declaration may be filed at any time at least 90 days after an initial demand to bargain has been made by a certified labor organization.

38.    Upon issuance of an order directing MMC, the parties must select a mediator within seven days. Labor Code section 1164(b) requires the party compelled into MMC to pay for one-half of the cost of the mediator's hourly rate. In

other words, the employer must pay 50 percent of the cost of a compulsory arbitration process into which the employer was forced, without its consent.

39.     The mediator can communicate "informally" and off the record with the parties to "clarify or resolve issues." Cal. Code of Regulations, tit. 8 ("Regs.), § 20407(a)(2). At the conclusion of the mediation period, unless the parties mutually agree to extend the period for another 30 days, the mediator certifies that the mediation phase of the MMC process has been "exhausted." Lab. Code § 1164(c). The mediator, now acting as an arbitrator, presides over the "on-the-record" phase of MMC, including the presentation of witnesses, the admission of exhibits, the administering of oaths, and the power to sanction employers who refuse to "participate or cooperate" in the MMC process, including by adopting the proposed contract terms of the union. *See* Regs., § 20407(a). Absent agreement, and based on the "record" of testimony and admitted evidence, the mediator dictates the terms of the collective bargaining agreement—a function beyond the role of "mediator" in the ordinary sense of that term.

40.     The statutory "mediator" has broad discretion to set the terms in accordance with his own views of industrial policy, and may impose conditions on one employer that are not imposed on a competitor; in fact, nothing in the MMC Statute prohibits dissimilar terms between similar agricultural businesses. The mediator "may consider" certain statutory factors to guide his decision-making, such as "[t]he financial condition of the employer and its ability to meet the costs of the contract," but there is no legal requirement that he apply those criteria in reaching his decision. Lab. Code § 1164(e). The statutory criteria are "nonexclusive" and do not preclude the "mediator" from considering factors not listed. Nor does the statute provide guidance as to how he should weigh each listed factor, should he decide to

apply them.[3] Even so, the statutory provisions that allow the mediator to consider these factors in resolving myriad disputed contract terms, or that direct that his particular determinations have some minimal support in the record, provide zero assurance that similarly situated employers will receive the same or similar results under the law.

41.    The California Court of Appeal explained why this is "the very antithesis of equal protection":

> Inevitably, each imposed CBA will still be its own set of rules applicable to one employer, but not to others, in the same legislative classification concerning such matters as wages, benefits, working conditions, hiring, disciplinary and termination procedures, union dues, union membership requirements, duration of the CBA, and other terms and conditions of employment and/or of the employer-union

---

[3] Section 1164(e) states: "In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings, including:

(1) The stipulations of the parties.

(2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands.

(3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements.

(4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed.

(5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed."

relationship. Thus, the necessary outworking of the MMC statute is that

each individual employer (within the class of agricultural employers

who have not entered a first contract) will have a distinct, unequal,

individualized set of rules imposed on it.

*Gerawan Farming, Inc.* v. *ALRB*, 187 Cal. Rptr. 3d 261, 294-95 (2015),

*rev'd*, 3 Cal. 5th 1118 (2017).

42.    After the "mediator" decides the terms of the collective bargaining agreement, only the employer and the union—but not the farm laborers, who are excluded from participating in MMC—have seven days to petition the ALRB for modification of that decision. Lab. Code § 1164.3(a). ALRB review is discretionary, highly deferential, and limited to considering whether certain provisions are "unrelated to wages, hours, or other conditions of employment," "based on clearly erroneous findings of material fact," or "arbitrary or capricious." *Id.*

43.    The mediator's "report" to the Board setting forth the CBA terms to be imposed must include "the basis for the mediator's determination" and "shall be supported by the record." Lab. Code § 1164(d). A party may challenge the mediator's report by seeking Board review within seven days. *Id.*, § 1164.3(a). Review is discretionary, and the grounds for review are narrow.[4] If the Board determines that a *prima facie* case for review has not been made, or if no petition for review is filed, the report becomes the final order of the Board. *Id.*, §§ 1164.3(b), (d). If, upon review, the Board finds that one or more grounds for review have been established, it will order the mediator to modify the problematic terms of the CBA. *Id.*, § 1164.3(c).

---

[4] The grounds for such review are that a provision of the CBA set forth in the mediator's report is (1) unrelated to wages, hours, or other conditions of employment, (2) based on clearly erroneous findings of material fact, or (3) arbitrary or capricious in light of the mediator's findings of fact. Lab. Code § 1164.3(a). If a prima facie case for review is not shown, or if no petition is filed, the report becomes the final order of the Board. *Id.*

44.    Within 30 days after the ALRB's order becomes final, the employer and the union may seek review before either a California appeals court or the California Supreme Court. Lab. Code § 1164.5(a). The workers may not challenge the terms imposed, because the Board does not deem farm laborers as "parties" to MMC. Judicial review is limited to examining whether the ALRB "acted without, or in excess of, its powers or jurisdiction;" the ALRB failed to "proceed[] in the manner required by law;" or "[t]he order or decision of the [ALRB] was procured by fraud or was an abuse of discretion." *Id.*, § 1164.5(b). A court may also determine whether the order violates the U.S. Constitution or the California Constitution. *Id.*, § 1164.5(b)(4).

45.    Although the employer (or labor organization) may seek judicial review of the final ALRB order, the parties are required to immediately implement the terms of the "contract" imposed under MMC. *See* Lab. Code § 1164.3(f)(2). The filing of a petition for review does not stay the final Board order unless the court finds, "by clear and convincing evidence," that the petitioner will be irreparably harmed by the implementation of the Board's order and has a likelihood of success on appeal. *Id.*, § 1164.3(f)(3). A bond must be posted by the party seeking review "in the amount of the entire economic value of the contract as determined by the board as a condition to filing a petition for a writ of review." Lab. Code § 1164.5(d). "[T]he 'entire economic value of the contract' means the difference between the employees' existing wages and economic benefits and those set forth in the contract." (*Ibid.*)

46.    The MMC order is treated by law as if it were a consensual collective bargaining agreement, with the consequence that employees may not seek to decertify the union until the end of the contract's final year. By invoking MMC, therefore, a union facing the prospect of decertification can maintain its position as exclusive bargaining representative for years, without any showing of support by the workers it purportedly represents. There is at least one important distinction between

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the *enforceability* of an MMC "agreement" and a consensual CBA: In the event the employer violates a term of the former, it exposes itself to the possibility of a contempt citation for violation of a decision and order of a State agency, as opposed to facing merely a claim for contractual damages.

## V.    PROCEDURAL BACKGROUND

### A.    The Majority Support Petition ("MSP") Certification

47.    On January 10, 2024, the UFW submitted a majority support petition, which was accompanied by authorization cards allegedly signed by 47 Olive Hill agricultural employees. The ALRB certified the UFW as the bargaining representative for Olive Hill's farmworkers on January 16, 2024.

48.    On January 26, 2024, the UFW sent a letter requesting Olive Hill to bargain over the terms of a CBA (Exhibit 1), thus triggering the 90-day period before MMC may be demanded. *See* Lab. Code § 1164(a)(2).

### B.    The MMC Process Has Begun

49.    The MMC mediator, Matt Goldberg, presided over the first "off-the-record" confidential mediation session on February 11, 2025. The mediator also scheduled a follow-up session on March 13, 2025.

50.    The UFW failed to provide an updated proposal sufficiently in advance of the March 13, 2025 mediation session, and the mediator pushed the session to May 22, 2025.

51.    When the arbitration phase of MMC concludes, the mediator shall file his report with the ALRB within 21 days "that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process." Lab. Code § 1164(d).

52.     The continued delay from the UFW leaves Olive Hill unable to anticipate when the ALRB could issue a final decision and order imposing the MMC "agreement" on Olive Hill and its employees.

## VI.     THE LEGAL AND PRACTICAL CONSEQUENCES OF MMC

53.   The certification of a labor organization is akin to the grant of a monopoly right to a public utility or common carrier, whereby the state designates the union as the workers' exclusive bargaining representative. *See Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.,* 24 Cal.3d 458, 481-82 (1979), quoting *James* v. *Marinship Corp.,* 25 Cal.2d 721, 731 (1944); *see also J. I. Case Co.* v. *NLRB,* 321 U.S. 332, 335 (1944) (likening terms of collective bargaining agreement to "to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service). Once certified, nothing – other than the passage of 90 days after the union's initial demand to bargain – stands between the employer and a State-imposed MMC "contract."

### A.     Compelled Association

54.     The MMC contract forces WGA members thrust into MMC, including Olive Hill, to associate with the UFW against its will. *See Janus* v. *American Federation of State, County, and Mun. Employees, Council 31* 585 U.S. 878, 892 (2018) (*Janus*) ("[f]reedom of association . . . plainly presupposes a freedom not to associate]; *see also Roberts* v. *U.S. Jaycees,* 468 U.S. 609, 623 (1984) ("Infringements on [the right to associate for expressive purposes] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."). But a compulsory collective bargaining agreement also infringes on the right of *workers* to speak and to associate, because the ALRA bars their right to seek to remove the union during the term of the MMC

1  "agreement." That amounts to state-compelled association, a direct impingement on

2  the farm workers' liberty interests.

3      55.    In upholding the NLRA against a constitutional due process challenge,

4  the U.S. Supreme Court held that laborers have a "fundamental right" to organize

5  and to select representatives of their own choosing. *See Jones & Laughlin,* 301 U.S.

6  at 33, citing *American Steel Foundries* v. *Tri-City Council,* 257 U.S. 184, 209

7  (1921) (Taft, C.J.) (the employees' right of self-organization was "essential to give

8  laborers opportunity to deal on an equality with their employer"). This right of self-

9  determination "is guaranteed by the federal Constitution as an incident of freedom

10  of speech, press and assemblage, and it is not dependent upon the existence of a

11  labor controversy between the employer and his employee." *See County Sanitation*

12  *Dist.* v. *L.A. Cty. Employees*, 38 Cal.3d 564, 587-88 (1985) (citations omitted);

13  *accord id.*, at 596 (Bird, C.J., concurring), *citing American Steel Foundries*, *supra* at

14  209.

15      56.    Congress did not create this "fundamental right" when it enacted the

16  NLRA; rather, it "safeguarded" *existing constitutional protections* against state

17  interference in the associational rights of workers. *Jones & Laughlin*, 301 U.S. at

18  33-34. As the Supreme Court has explained, "[e]mployees have as clear a right to

19  organize and select their representatives for lawful purposes as the [employer] has to

20  organize its business and select its own officers and agents." *Amalgamated Workers*

21  *v. Edison Co.*, 309 U.S. 261, 263-64 (1940). Thus, the NLRA's prohibition against

22  government interference in the exercise of those choices, "'instead of being an

23  invasion of the constitutional right of either, was based on the recognition of the

24  rights of both.'" *Jones & Laughlin*, 301 U.S. at 34, quoting *Texas N.O.R. Co.* v. *Ry.*

25  *Clerks,* 281 U.S. 548, 570 (1930).

26      57.    Conversely, there could be "no clearer abridgement" of free choice than

27  to grant exclusive bargaining status to a union "selected by a minority of its

28  employees, thereby impressing that agent upon the nonconsenting majority." *Int'l*

*Ladies' Garment Workers' Union* **v**. *NLRB,* 366 U.S. 731, 737 (1961). Regulations that infringe on the freedom not to associate or that compel association may be justified only "to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Smith* v. *Regents of University of California,* 4 Cal.4th 843, 853 (1993) (internal quotation marks omitted). Assuming that the State may place any limitations on the employee's right to withdraw his or her support for a union, "the resulting burden on freedom of association requires that the procedure be carefully tailored to minimize the infringement." *Ibid*.

58.     Where either the union (or the MMC contract) enjoys majority support, the State can claim the sacrifice of the labor rights of both employer and individual employees is necessary to enable the union to effectively represent the best interests of the bargaining unit as a whole. There is no requirement that the MMC contract (or the UFW itself) enjoys majority support. Quite the contrary, the workers have no opportunity to vote on the forced contract, let alone to participate in (or to observe even silently) the MMC process. *See Gerawan Farming, Inc.* v. *ALRB*, 40 Cal.App.5th 241, 278 (2019) (*Gerawan II*) (no constitutional right of public access to on-the-record MMC proceedings).

59.   The impairment of the associational rights of workers goes well beyond the subordination of the individual's economic interests to the collective. On information and belief, every MMC contract imposed by the ALRB includes a so-called "union security" clause – a provision in union contracts which require the employer to fire any worker who refuses to surrender a portion of his wages to the union as "union dues" or "agency fees."[5] Because the Board deems union security

---

[5] *See also Gerawan Farming, Inc.* v. *ALRB,* 52 Cal.App.5th 141, 169 (2020) (*Gerawan III*) (quoting testimony by UFW First-Vice President Elenes) (emphasis added) ("Well, obviously ... we have an obligation to represent all employees .... ***And again, all our contracts have some type of union security language*** that

clauses to be a standard or "typical" provision in virtually every union agreement, the employer's refusal to accede to this clause has been held to constitute bad faith bargaining, *even where the employer has been compelled into MMC. See Gerawan III,* 52 Cal.App.5th at 183-184 & n. 19.

60.   Requiring an employer to fire an employee who refuses to subsidize the union's speech-related activities infringes on the freedom of association between the employee and employer. Olive Hill has standing to seek redress for any injury due to direct violations of its own associational rights, including not only which employees it must fire, but – under the detailed and comprehensive seniority, layoff, promotion, and disciplinary rules that are a staple of every MMC contract – which employees it can rehire.

61.   These infringements do not strictly involve regulation of hours, pay, or working conditions. They directly impact First Amendment rights. To again consider the analogy with a grant of a monopoly to a public utility: "The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds." *West Virginia State Board of Education* v. *Barnette*, 319 U.S. 624, 639 (1943).

**B.      Freedom Of Labor**

62.   Farmworkers have some "generalized due process right to choose one's field of private employment," *Conn* v. *Gabbert,* 526 U.S. 286, 291-92 (1999), a right recognized by Justice Brandeis in the last of the Court's unanimous Kansas

indicates that the employees are either going to pay agency fees or going to pay dues, membership dues. And obviously we need that to be able to collect dues, be able to collect agency fees so that we can fund the work that we're going to have to do to administer the contract and continue improving the conditions of other farm workers.")

Act decisions. *See Dorchy II*, 272 U.S. at 311 (Brandeis, J.) ("The right to carry on business — be it called liberty or property — has value. To interfere with this right without just cause is unlawful."); *see also Ry. Employees' Dep't* v. *Hanson,* 351 U.S. 225, 234 (1956) ("[T]he right to work, which the Court has frequently included in the concept of 'liberty' within the meaning of the Due Process Clauses may not be denied by the Congress."). The right to hold specific private employment "free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene* v. *McElroy*, 360 U.S. 474, 492 (1959); *Merritt* v. *Mackey*, 827 F.2d 1368, 1370 (9th Cir. 1987) ("It is indisputable that an individual may have a protected property interest in private employment."). An employer has standing to redress for injuries it suffers as a consequence of the deprivation of constitutional rights of its employees.[6]

63.    A compulsory CBA affects the "freedom of labor." *Wolff I*, 262 U.S. at 542. For example: A compulsory *collective* bargaining agreement inherently eliminates an ***employee's right to individually bargain with the employer***. An individual worker may negotiate on the basis of his own best interests. A union has

_____

[6] *See, e.g.*, *Truax* v. *Raich,* 239 U.S. 33, 38 (1915) ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employee has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion and, by the weight of authority, the unjustified interference of third persons is actionable although the employment is at will."). *Wolff I,* 262 U.S. at 541 (emphasis added), is singularly instructive in this regard:

> We are considering the validity of the act as compelling the employer to pay the adjudged wages, and as forbidding the employees to combine against working and receiving them. The penalties of the act are directed against effort of either side to interfere with the settlement by arbitration. Without this joint compulsion, the whole theory and purpose of the act would fail. *The State cannot be heard to say, therefore, that upon complaint of the employer, the effect upon the employee should not be a factor in our judgment*.

SMRH:4897-0285-1624.7

leeway to "subordinate the interests of an individual employee to the collective interests of … the bargaining unit." *14 Penn Plaza LLC* v. *Pyett*, 556 U.S. 247, 269 (2009). Indeed, a union has "powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents." *Steele* v. *Louisville & Nashville R.R. Co*., 323 U.S. 192, 202 (1944).

64.     A compulsory collective-bargaining agreement affects **the right to strike**. "Collective-bargaining contracts frequently have included certain waivers of the employees' right to strike." *Mastro Plastics Corp.* v. *NLRB*, 350 U.S. 270, 356 (1956). Based on information and belief, *every* MMC contract imposed by the ALRB includes such a waiver.

65.     A compulsory CBA affects **the right to redress for employment grievances.** A union generally has "discretion" when performing its functions under "the collective-bargaining system." *Electrical Workers* v. *Foust*, 442 U.S. 42, 51 (1979). As a result, a worker has little ability to "force unions to process … claims" that the unions wish to drop. *Id*. Based on information and belief, every MMC contract supplants the right of workers to pursue claims as an individual with an intricate grievance and arbitration scheme whereby the union controls which workers are permitted to avail themselves of the process.

66.     A compulsory CBA affects **the right to vote on employment terms**. Workers ordinarily may vote (a so-called "ratification vote") on collective bargaining agreements. *See NLRB* v. *Rockaway News Supply Co*., 345 U.S. 71, 73 (1953). But under the MMC Statute, the "contract" takes effect by force of law, and without submission to the workers for their approval.

67.     The compulsory CBA in this case directly affects **the right of workers to hold the bargaining representative accountable** for its actions. Workers ordinarily have the right to "petition … for a decertification election, at which they would have an opportunity to choose no longer to be represented by a union." *Brooks* v. *NLRB*, 348 U.S. 96, 100–01 (1954). The MMC contract takes away that

right. Under Labor Code section 1156.7(b), a collective bargaining agreement shall be a bar to a petition for election for the term of the agreement, but in any event such bar shall not exceed three years.

68.    An employee's interests in taking collective action, in pressing his own grievances, in voting, and in holding his bargaining representative to account are therefore in tension with the union's own interests in perpetuating its monopoly control over the bargaining rights of agricultural laborers (and, of course, its financial interest in continuing to compel farmworkers to hand over a portion of their paycheck as union fees). "It is difficult to assume that the incumbent union has no self-interest of its own to serve by perpetuating itself as the bargaining representative." *NLRB* v. *Magnavox Co.*, 415 U.S. 322, 325 (1974). The union invoking MMC has an interest in obtaining an "agreement" backed by the coercive power of the State, precisely *because* it diminishes the farmworker's right to self-determination and his take-home pay.

69.    The necessary outworking of the MMC process is to empower the union to seize fees from unwilling workers; to require WGA members thrust into MMC, including Olive Hill, to fire workers who refuse to subsidize the UFW; and to bar farm laborers from seeking to decertify the union until the final year of the "contract." At the same time, it forces employees (and their employer) to associate with a union they cannot dislodge, to pay union fees under a CBA they did not ratify, and to relinquish myriad rights, including (as is standard in every MMC contract) the right to strike.

## C.    Freedom Of Contract

70.    A compulsory collective bargaining agreement involves a total government takeover of the operations of the workplace—hours and breaks, pay and seniority, working conditions, and more – imposed by force of law. It leaves the workers and the employer no flexibility at all, because it dictates precisely how long the employee must work, how much he must be paid, or whether employees may

engage in constitutionally protected rights of collective action, including whether to replace or oust their bargaining representative.

71.  A CBA "is more than a contract; it is a generalized code to govern a myriad of cases . . . covering the whole employment relationship." *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578-79 (1960). Agreements reached through consensual negotiation are "an effort to erect a system of industrial self-government." *Id.* at 580.

72.  A compulsory CBA involves a takeover of labor-management relations of the workplace by the State — hours and breaks, hiring and firing, pay and seniority, working conditions, the adjustment of grievances, and more – all imposed by force of law. Unlike (e.g.) general minimum wage or maximum hours requirements where the state imposes floors or ceilings, California has undertaken to dictate every single term of the employment relationship at one particular workplace, including by curtailing the ability of farm laborers to exercise their constitutionally protected right to replace or oust their bargaining representative. This goes well beyond general police power legislation.

73.  Juxtaposed against this near complete takeover of one employer's economic relationship with its farm workers is the absence of any due process afforded the ostensible beneficiaries of the MMC Statute's protections. Farm workers are prevented from "intervening" in MMC proceedings, denied any statutory right of judicial review of the "contract," and barred from even observing in silence the "on the record" arbitral phase of MMC. *See Gerawan Farming, Inc.*, 39 ALRB No. 11, at 2, 7 (2013) ("The statutes and regulations governing MMC do not provide any mechanism for third parties to "intervene" in MMC proceedings," and concluding that intervention by workers "would be inconsistent with the structure of MMC and would undermine its functioning."); *Gerawan Farming, Inc.*, 39 ALRB No. 13 (2013) (barring worker access to the arbitration phase of MMC on the grounds that their presence was not in the public interest), aff'd, *Gerawan II*, 40

1  Cal.App.5th at 278. The workers must depend on the employer to raise their rights

2  in the MMC proceedings, or via the statutory review procedures.

3  **VII.    THE MERITS OF PLAINTIFFS' CONSTITUTIONAL CHALLENGES**

4  **CAN AND SHOULD BE DECIDED NOW**

5  74.    There are no exhaustion or abstention considerations standing in the

6  way of this Court deciding the merits of Plaintiffs' federal constitutional challenges

7  now, *before* WGA members thrust into MMC, including Olive Hill, suffer further

8  injury. Even before the inevitable imposition of a MMC contract, Olive Hill has

9  suffered, and continues to suffer, from being thrust into an unconstitutional process.

10  75.    In *Axon Enterprise, Inc.* v. *Federal Trade Commission*, 598 U.S. 175

11  (2023) (*Axon*), the Supreme Court explained that the plaintiff, who brought a facial

12  challenge based on "being subjected" to "unconstitutional agency authority," would

13  suffer the same constitutional injury regardless of whether he prevailed on his

14  separation of powers claim before the agency, i.e., his claim arose from subjection

15  to an unconstitutional proceeding. *Id.* at 191. As *Axon* explained: "The court could

16  of course vacate the FTC's order. But Axon's separation-of-powers claim is not

17  about that order; indeed, Axon would have the same claim had it *won* before the

18  agency. The claim, again, is about subjection to an illegitimate proceeding, led by an

19  illegitimate decisionmaker." *Ibid.* In other words, a "here-and-now injury," *Seila*

20  *Law LLC* v. *CFPB*, 591 U.S. 197, 212 (2020), once inflicted cannot be undone,

21  since "[j]udicial review of [plaintiffs'] structural constitutional claims would come

22  too late to be meaningful." *Axon*. 598 U.S. at 192.

23  76.    Federal precedent tilts decisively in favor of expeditious judicial

24  resolution of this facial constitutional challenge. "The questions of law presented in

25  these proceedings arise under the Constitution, not under the statute whose validity

26  is challenged." *See Johnson* v. *Robison,* 415 U.S. 361, 367 (1974) (citation and

27  quotation marks omitted). A declaratory relief action is uniquely suited to the

28  expeditious resolution of pure questions of law, especially those involving the

-30-

constitutionality of statutes. One of the reasons why declaratory relief is appropriate is to avoid requiring a plaintiff to expose himself to the risk of violating the law in order to challenge it. *See, e.g.*, *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 128-129 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat") (emphasis original); *Maryland Right to Life State Political Action Committee* v. *Weathersbee*, 975 F.Supp. 791, 794 (D. Md. 1997) (plaintiff "not required to violate state law to challenge it as violative of the Constitution, he need only face 'a credible threat of prosecution'") (quoting *International Soc'y for Krishna Consciousness* v. *Eaves*, 601 F.2d 809, 819 (5th Cir.1979)).[7]

77.    The threat here is indisputably real. Although the MMC process is moving forward, the Board, as an administrative agency, cannot decide the constitutionality of the MMC Statute. *See* Cal. Const. art. III, § 3.5. As the Supreme Court has held, "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to [42 U.S.C.] § 1983." *Patsy* v. *Florida Board of Regents*, 457 U.S. 496, 516 (1982). *See also Knick* v. *Township of Scott*, 139 S. Ct. 2162, 2167 (2019) (quoting *Heck* v. *Humphrey*, 512 U.S. 477, 480 (1994) (invoking "the settled rule is that 'exhaustion of state remedies is not a prerequisite to an action under [ 42 U.S.C.] § 1983.'").

---

[7] The justiciability of Plaintiffs' facial constitutional challenges is explained by the distinction between reviewing a decision by the **administrator** made "under" the statute and reviewing the decision by the **Legislature** that created the statutory scheme. The decision by the agency involves the application of a particular provision of the law to a particular set of facts or circumstances. Under those circumstances, a court should be reluctant to inject itself via interlocutory rulings. Among other reasons, these interim agency orders and discretionary decisions may or may not prove dispositive, or even relevant, as to the final agency action.

78.    As for the availability of state court judicial review, the MMC Statute provides only discretionary and limited review. *See* Lab. Code § 1164.5.[8] Moreover, it would be an exercise in futility to ask a lower state court to disagree with the California Supreme Court's holding in *Gerawan I* (*see* ¶ 5, *supra*), or to expect the California Supreme Court to overturn its own decision. *Cf. Sweet* v. *Cupp*, 640 F.2d 233, 236 (9th Cir. 1981) (noting, in a habeas case: "A number of circuits have held that a petitioner may be excused from exhausting state remedies if the highest state court has recently addressed the issue raised in the petition and resolved it adversely to the petitioner, in the absence of intervening United States Supreme Court decisions on point or any other indication that the state court intends to depart from its prior decisions."). "[T]he futility doctrine … promotes comity by requiring exhaustion where resort to state courts would serve a useful function but excusing compliance where the doctrine would only create an unnecessary impediment to the prompt determination of individuals' rights." *Id.*[9]

## A.    THERE ARE NO GROUNDS WHICH COULD SUPPORT ABSTENTION OR A STAY OF THIS ACTION

79.    The circumstances here also do not support this Court exercising discretion to abstain, *Younger* v. *Harris*, 401 U.S. 37 (1971), from deciding Olive Hill's federal constitutional claims.[10] First, regardless of whether Olive Hill (or any companies which are members of WGA) could obtain full review on the merits in

---

[8] This is so, even though that holding is distinguishable from the procedural posture of Olive Hill's case, i.e., Gerawan's employees could seek to decertify the union **before** the MMC contract was imposed.

[9] Although some of Plaintiffs' federal constitutional arguments have not been addressed by the California Supreme Court, *see* ¶¶5-9, *supra*, it would be inefficient (to say the least) for this Court to resolve only some of Plaintiffs' federal constitutional challenges.

[10] "There is no discretion to abstain in cases that do not meet the requirements of the abstention doctrine being invoked. " *Martinez* v. *Newport Beach City*, 125 F.3d 777, 780 (9th Cir. 1977) (citations omitted).

state court at some indefinite time in the future, *Younger* abstention requires state proceedings to be pending. *See Ankenbrandt* v. *Richards*, 504 U.S. 689, 705 (1992) ("Absent any *pending* proceeding in state tribunals, therefore, application by the lowers courts of *Younger* abstention was clearly erroneous.") (emphasis original). The Supreme Court recently reaffirmed, in *Sprint Communications, Inc.* v. *Jacobs*, 571 U.S. 69 (2013), the limited "scope" of the types of state proceedings warranting *Younger* abstention. "'[O]nly exceptional circumstances … justify a federal court's refusal to decide a case in deference to the States,'" 571 U.S. at 78 (quoting *New Orleans Public Service, Inc.* v. *Council of City of New Orleans* (*NOPSI*), 491 U.S. 350, 368 (1989)). Those circumstances are: (1) "state criminal prosecutions"; (2) "certain 'civil enforcement proceedings'"; and (3) "'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions.'" 571 U.S. at 78, quoting *NOPSI*, 491 U.S. at 368. The only relevant ongoing state proceedings here involving the MMC Statute are the mediation and negotiations before the mediator, which do not trigger *Younger*.[11]

80.    In *Sprint*, the Supreme Court held that the Iowa Utility Board's (IUB) proceedings to resolve the question of whether Voice over Internet Protocol (VoIP) calls were subject to intrastate regulation "does not fall within any of the three exceptional categories … and therefore does not trigger *Younger* abstention." 571 U.S. at 70, 79. The only category potentially applicable was civil enforcement proceedings.[12] However, such proceedings "have generally concerned state

---

[11] In *Sprint*, as in *NOPSI*, the Supreme Court "assume[d] without deciding … that an administrative adjudication and the subsequent state court's review of it count as a 'unitary process' for *Younger* purposes," instead answering the question whether the "initial [administrative] proceeding is of the 'sort … entitled to *Younger* treatment." 571 U.S. at 592 (quoting *NOPSI*, 491 U.S. at 369).

[12] The IUB proceeding "was civil, not criminal in character, and it did not touch on a state court's ability to perform its judicial function." *Sprint*, 571 U.S. at 78-79 (providing as examples of the latter a civil contempt order or requirement for posting bond pending

proceedings 'akin to a criminal prosecution' in 'important respects.'" *Id*. at 79, quoting *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592, 604 (1975). In other words, enforcement actions "initiated by 'the State in its sovereign capacity'" "to sanction the federal plaintiff, *i.e.,* the party challenging the state action, for some wrongful act." 571 U.S. at 79-80 (quoting *Trainor* v. *Hernandez*, 431 U.S. 434, 444 (1977).) The IUB proceedings were "initiated" by a "private corporation" and the IUB's "adjudicative authority … was invoked to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act." 571 U.S. at 80. The Supreme Court emphasized the importance of the "quasi-criminal context," expressly disapproving of the attempt to "extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest," as "irreconcilable with [the Court's] dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Id.* at 81-82 (quoting *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 236 (1984)). In other words, one of the three "exceptional categories" must be satisfied before "additional factors," i.e., "important state interests" and "adequate opportunity to raise [federal] challenges" are considered. *Sprint*, 571 U.S. at 81.

81.    The MMC proceedings are similar in relevant respects to the IUB proceedings the Supreme Court held did not trigger *Younger*, having been "initiated" by the UFW (a private party and not the state) following the parties

---

appeal). Regarding the third *Sprint* category, the Ninth Circuit defines the relevant question as whether the federal plaintiff "question[s] the *process* by which [state] courts compel compliance" with state orders. *See Cook* v. *Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018) (emphasis original). Under this definition, for example, "[t]he mere existence of the appeal bond requirement is not enough," a plaintiff must "actually *challenge* this appeal bond requirement." *Dignity Health* v. *Dept. of Industrial Relations, Division of Labor Standards Enforcement*, 445 F.Supp.3d 491, 497-98 (N.D. Cal. 2020).

failure to reach a CBA (and not to punish WGA members thrust into MMC, including Olive Hill, for any alleged wrongful conduct). (Indeed, *Gerawan I* characterized MMC as a "quasi-legislative" proceeding.) Even if Board review of the mediator's report and thereafter judicial review of the Board's resulting order is sought, such review is initiated by a "party," and not the state. (Lab. Code §§ 1164.3 & 1164.5.)[13]

82.    More pertinent, the Ninth Circuit did not disturb the district court's holding in *Lopez* v. *Shiroma*, 2014 WL 3689696, at **17-18 (E.D. Cal. July 24, 2014), aff'd in part, rev'd in part, and remanded, 668 Fed. Appx. 804 (9th Cir. 2016), that ongoing ALRB proceedings did not warrant *Younger* abstention. In that case, the district court concluded:

> The facts of this case are similar to the facts of *Sprint* and *Readylink* in that ongoing ALRB proceedings were initiated to resolve a dispute between private parties. Plaintiff sought the Board's approval and oversight when she petitioned for a decertification election. Later, Plaintiff, Gerawan and the UFW sought review from the ALRB when each alleged objections to aspects of the election. Plaintiff alleges that Defendant [ALRB Regional Director] Shawver filed some enforcement actions against Gerawan during these proceedings. However, this Court finds that these activities are secondary to the larger issue in dispute— which is whether the decertification election was conducted properly. This is a dispute between Plaintiff, her employer and the Union; not, at this juncture, between the ALRB and Gerawan or the UFW. Thus, this is not the sort "exceptional case" where *Younger* applies.

---

[13] Further indicia of the MMC process not being quasi-criminal is the California Supreme Court's characterization of the MMC process as "result[ing] in 'quasi-legislative action'" and "a continuation of the ordinary bargaining process." (*Gerawan I*, 3 Cal.5th at 1133, 1156.)

1  2014 WL 3689696, at *8.[14] In sum, the exceptional circumstances allowing

2  discretionary *Younger* abstention are not present here.

### FIRST CAUSE OF ACTION

### VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH

### AMENDMENT OF THE U.S. CONSTITUTION

**(Compulsory Arbitration)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

9    83.    Plaintiffs incorporate by reference and realleges each allegation set

10  forth in Paragraphs 1 through 82 above.

11    84.    "No State shall ... deprive any person of life, liberty, or property,

12  without due process of law; nor deny to any person within its jurisdiction the equal

13  protection of the law." U.S. Const. amend. XIV, §1.

14    85.    42 U.S.C. § 1983 states: "Every person who, under color of any statute,

15  ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be

16  subjected, any citizen of the United States or other person within the jurisdiction

17  thereof to the deprivation of any rights, privileges, or immunities secured by the

18  Constitution and laws, shall be liable to the party injured in an action at law, suit in

19  equity, or other proper proceeding for redress."

---

[14] In *ReadyLink Healthcare, Inc.* v. *State Comp. Ins. Fund,* 754 F.3d 754, 760 (9th Cir. 2014), the Ninth Circuit held that *Younger* abstention did not attach to a decision of the California Department of Insurance, when the adjudication was initiated to resolve a dispute between an employer and a state insurance fund that acted as a private party, explaining that "[i]f the mere 'initiation' of a judicial or quasi-judicial administrative proceeding were an act of civil enforcement, *Younger* would extend to every case in which a state judicial officer resolves a dispute between two private parties."

86.    California's law mandating compulsory arbitration and allowing the ALRB to impose contract terms on certain parties without imposing similar terms on similarly situated parties violates both due process and equal protection.

87.    In depriving Plaintiffs of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

88.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### A.    California's Compulsory Arbitration Scheme Deprives Farm Owners Of Liberty And Property Without Due Process Of Law.

89.    Since the Magna Carta, the essence of due process is that "there can be no proceeding against life, liberty, or property . . . without the observance of . . . general rules." *See, e.g.*, *Hagar* v. *Reclamation District No. 108*, 111 U.S. 701, 708 (1884); *Hurtado* v. *California*, 110 U.S. 516, 535-36 (1881) ("Law must be not a special rule for a particular person or a particular case, but 'the general law,' and thus excluding, as not due process of law, special, partial, and arbitrary exertions of power under the forms of legislation.") (cleaned up). "The words 'due process of law,' were undoubtedly intended to convey the same meaning as the words, 'by the law of the land,' in Magna Carta." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 276 (1855); *see also Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 847 (1992) ("The guaranties of due process, though having their roots in Magna Carta's '*per legem terrae*,'[15] … have in this country become bulwarks also against arbitrary legislation.") (citations and quotations omitted). Traditionally, "law of the land" has been always understood to

---

[15] The Latin term *per legem terrae* translates to "by the law of the land" or "by due process of law."

require some measure of generality. An enactment that applied only to a fixed and identifiable class of people would not qualify as the law of the land. *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672 (2012).

90.    "From the earliest time, it was understood that the due process right was 'intended to secure the individual from the arbitrary exercise of the *powers of government*.'" *Martinez* v. *High*, 91 F.4th 1022, 1032 (9th Cir. 2024) (Bumatay, J., concurring in the judgment, emphasis original) (quoting *Hurtado*, 110 U.S. at 527); *see also Daniels* v. *Williams*, 474 U.S. 327, 331 (1986) (quoting *Wolff* v. *McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent* v. *West Virginia*, 129 U.S. 114, 123 (1889)")). These precedents remain valid. *See, e.g., United States* v. *Winstar Corp.*, 518 U.S. 839, 897–98 (1996) (plurality opinion of Souter, J., joined by Stevens, O'Connor, and Kennedy, JJ.) (reaffirming "*Hurtado* [and] its principle of generality"); *United States* v. *Lovett*, 328 U.S. 303, 317 (1946) ("[T]hose who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons."). The law today continues to reflect "the Framers' concern that a legislature should not be able unilaterally to impose a substantial deprivation on one person." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 242 (1995) (Breyer, J., concurring in the judgment).

91.    The California Supreme Court attempted to portray the MMC process as merely "a continuation of the ordinary bargaining process," and compulsory arbitration as a mere "bargaining tool." *Gerawan I*, 3 Cal.5th at 1157. But compulsion is not bargaining. *Virginian Ry. Co.*, 300 U.S. at 543, 548.

92.    Neither Olive Hill nor its workers agreed to compulsory arbitration as a "bargained-for" exchange. *Pyett*, 556 U.S. at 257; *see also Volt Info. Scis., Inc.* v. *Bd. of Trs. of Leland Stanford Junior Univ*, 489 U.S. 468, 479 (1989) (arbitration "is

a matter of consent, not coercion"). Instead, Olive Hill was forced into this process based on the exercise of the State's "coercive power" over its employment relationship, *Blum* v. *Yaretsky*, 457 U.S. 991, 1004 (1982), on demand by a private, self-interested actor. "The terms of the 'agreement' determined by the arbitrator [are] imposed upon [the employer] by force of law." *Gerawan I*, 3 Cal.5th at 1091 (citation omitted)). The *ad hoc*, arbitrary drafting of private contracts by a "mediator," which is then imposed by a state agency, without any chance for workers or owners to disapprove, is a coercive substitute for collective bargaining.

93.     The imposition of the MMC order has the legal effect of barring workers from seeking to decertify the union until the final year of the contract, no matter how large a majority of the workers wish to rid themselves of the union. This "makes these [farmworkers] and others similarly situated [] prisoners of the Union." *Emporium Capwell Co.* v. *W. Addition Cmty. Org.*, 420 U.S. 50, 73 (1975) (Douglas, J., dissenting). The systematic elimination of the farmworkers' right to labor, replacing in its stead a complex scheme of rules and restrictions imposed by arbitral fiat, unquestionably infringes upon liberty and property interests of employees and their employer.

**B.     The U.S. Supreme Court Has Already Concluded That Compulsory Arbitration Schemes Similar To California's MMC Statute Violate Due Process.**

94.     In his monumental study of the Taft Court, Professor Robert Post states that the most striking feature about *Wolff Packing* "is its unanimity," which he ascribes to the Justices' shared recognition of "a sphere of individual liberty that was beyond the administrative management of the state."[16] As with the Kansas Act

_____

[16] Robert Post, *The Taft Court: Making Law for a Divided Nation: 1921-1930* (Oliver Wendell Holmes Devise History of the Supreme Court of the United States), Vol. 10, Ch. 5 at 793 (2023) (Cambridge University Press). *See also* David A. Schwarz, *Compelled Consent:* Wolff Packing *and the Constitutionality of*

invalidated in *Wolff,* the MMC unconstitutionally intrudes on "the freedom of contract and of labor secured by the Fourteenth Amendment." *Wolff I*, 262 U.S. at 540.

95.    In *Wolff I*, the U.S. Supreme Court examined a Kansas statute that, among other provisions, required employers "to pay the wages fixed" by the state agency in compulsory arbitration proceedings, and forbade the workers to "strike against them." *Id*. at 540. The joint compulsion scheme in *Wolff Packing* was not about the "regulat[ion] [of] wages or hours of labor either generally or in particular classes of business." *Wolff II*, 267 U.S. at 565. *Wolff Packing* dealt with a "system of compulsory arbitration" eerily similar to MMC, one that produced individualized, state-imposed labor contracts that extended no further than the employer and its workers subject to this joint compulsion. *Id*. at 569.

96.    The compelled contracting scheme in *Wolff Packing* was a response to post-World War I strikes, which threatened to cripple the nation's railroads, coal mines, steel mills, and other heavily unionized industries. In 1920, Kansas created an administrative agency, the so-called "Court of Industrial Relations," or "CIR," to thwart labor strife in industries "affected with a public interest," defined to include businesses "engaged in the manufacture of food, and clothing, and the production of fuel." *Wolff I,* 262 U.S. at 533.

97.    The Kansas Act required such businesses and their employees to continue operations and employment "on terms fixed by an agency of the State if they cannot agree. . . . [T]he act gives the Industrial Court authority to permit the owner or employer to go out of the business, if he shows that he can only continue on the terms fixed at such heavy loss that collapse will follow," a "privilege" which the Supreme Court described as "generally illusory," in light of the requirements to

---

*Compulsory Arbitration*, 12 NYU J. of Law & Liberty 14 (2018) (comparing the MMC contracting regime with the Kansas act struck down in *Wolff Packing*).

obtain that relief. *Id*., at 533-534. It "compel[led]" employers and employees in the food, clothing, and fuel industries "to continue in their business and employment on terms fixed by an agency of the state, if they cannot agree." *Id.* Worker rights were also constrained: "A laborer dissatisfied with his wages is permitted to quit, but he may not agree with his fellows to quit or combine with others to induce them to quit." *Id*.

98.    Once subjected to the CIR's wage and hour orders, an employer could avoid compliance only by application for permission to limit or cease operations, "if said application found to be in good faith and meritorious."[17] The employer's only means of exit would be to demonstrate the ruinous financial consequences of the order. In contrast, the MMC Statute provides no *ex ante* mechanism to allow the employer to avoid similar consequences, even if the economic impacts of the terms to be imposed are (theoretically) considered by the arbitrator in fixing wages, hours, benefits and other conditions of employment.

99.    As with MMC, the Kansas scheme depended on the power of the State to compel employees and their employer to submit to a coercive process "to secure such continuity of the business as the legislature believes would result from the settlement of industrial disputes by compulsory arbitration." Alpheus Mason, *The Labor Decisions of Chief Justice Taft,* 78 U. Pa. L. Rev. 585, 620, n. 79 (1930). Though Wolff Packing's business losses the previous year were due to world-wide business conditions beyond the company's control, the CIR concluded that "'the laboring man is not in a position to take advantage of rising markets or prosperous conditions.'"[18] As such, "[t]he purpose of the Act was to ensure that laborers employed in 'these essential industries…receive a fair wage and that capital

---

[17] 1920 Kan. Sess. Laws ch. 29, § 16.

[18] Schwarz, *Compelled Consent, supra* n.17 at 58 (footnotes and internal quotations omitted).

SMRH:4897-0285-1624.7                    VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  invested therein shall receive a fair return,'" regardless of whether the result would

2  further plunge Wolff Packing's operations into the red.[19]

3      100.    *Wolff Packing* involved the very kind of selective deprivation of liberty

4  that "due process of law" in its fundamental sense prohibits. The *Wolff* trilogy

5  invalidated a "system of compulsory arbitration" through which the state imposed

6  bespoke contracts extending no further than a given employer and its workers. *Wolff*

7  *II*, 267 U.S. at 569. In distinguishing the Kansas scheme from laws of general

8  application, the Court noted that the state did "*not … regulate wages or hours of*

9  *labor either generally or in particular classes of business.*" *Id*. at 565 (emphasis

10 added). It explicitly *refused* to decide whether the same requirements "would be

11 valid" if they had been made "either general or applicable to all businesses of a

12 particular class." *Id*. at 569. There can be no doubt, in short, that *Wolff Packing*

13 rested—at least in part—on "the traditional 'rule of law' assumption that generality

14 in the terms by which the use of power is authorized will tend to guard against its

15 misuse to burden or benefit the few unjustifiably." *Winstar Corp.*, 518 U.S. at 897 &

16 898, n. 43).

17     101.    *Wolff Packing*'s condemnation of *selective* deprivations of liberty has a

18 firm grounding in the text and history of the Due Process Clause. In contrast,

19 *Lochner* and other pre-New Deal "substantive due process" cases struck down laws

20 of *general* application, including those prohibiting all bakers from working for more

21 than sixty hours a week, *Lochner* v. *New York*, 198 U.S. 45 (1905), or general

---

[19] *Id*. As Professor Post explains, Chief Justice Taft "apparently based his [initial draft] decision on the theory that preparing human food was not 'affected with the public interest.' In his final, published version, however, Taft merely cast strong doubt on this question and decided that, even if the Wolff Packing Company were clothed with the public interest, its owners and workers could not be ordered to continue in business "on terms fixed by an agency of the State." Post, at 793, quoting *Wolff I*, 262 U.S. at 534.

regulations setting minimum wages for all workers in particular industries, e.g., *Adkins* v. *Children's Hospital,* 261 U.S. 525 (1923).

102. The New Deal Court's rejection of *Lochner* is consistent with democratic, majoritarian values. In contrast, invalidating a selective law "does not disable any governmental body from dealing with the subject at hand," but instead "merely means that the prohibition or regulation must have a broader impact." *Railway Express Agency* v. *New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring).

103. In depriving Olive Hill of the rights described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

104. An actual and substantial controversy exists between Olive Hill and the Board regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

105. Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

# SECOND CAUSE OF ACTION

## VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

### (Lack of Adequate Safeguards)

### (Against All Defendants)

### (42 U.S.C. § 1983)

**A.     MMC Violates Due Process By Depriving The Employer With No Exit From Compulsory Arbitration Or Any Safeguards To Secure A Reasonable Rate Of Return.**

106.   Plaintiffs incorporates by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

107.   "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

108.   42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

109.   In depriving WGA members thrust into MMC, including Olive Hill, of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

110.   Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

111.    In the context of public utility regulation, the U.S. Supreme Court has set out constitutional limitations on the ratemaking power of the national government to guard against the risk of confiscation that arises if the rates in question are not high enough to allow for recovery of the fixed investments in the enterprise. *See Fed. Power Comm'n* v. *Hope Natural Gas,* 320 U.S. 591 (1944). While these rules leave regulators of public utilities, playing a role not unakin to the mediator, some discretion in making these calculations, they do not grant unchecked power to set up a rate schedule that fails to allow the company to recover sufficient revenues to avoid operating at a loss.

112.    The U.S. Supreme Court has recognized that a collective bargaining agreement "may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules of service." *See J.I. Case*, 321 U.S. at 335. MMC forces the employer to enter into a collective bargaining arrangement without providing any exit right or mechanism that secures the employer "a just and reasonable return" on its extensive investment in all aspects of its business operations.

113.    In *Birkenfeld* v. *City of Berkeley,* 17 Cal. 3d 129 (1976), the California Supreme Court struck down a Berkeley Charter Amendment that imposed "a blanket rollback of all controlled rents" and would prohibit any adjustments in maximum rents except under a unit-by-unit procedure which, the court determined, was unworkable. *Id*. at 136. Although the law required a reasonable rate of return, the Court held that it did not provide adequate safeguards to reasonably allow the rent board to adjust rents to allow for such a return, *id*. at 170-71, because there was no provision under the law that would permit <u>timely</u> adjustments <u>before</u> the existing rent caps forced the property owners to sell (or to abandon) their properties rather than to maintain them at a loss. *See id*. at 165.

114.    *Birkenfeld* held that "whether a regulation of prices is reasonable or confiscatory depends ultimately on the result reached, . . . *such a regulation may be*

*invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties.* It is to the possibility of such facial invalidity that our present inquiry is directed." *Ibid.* (emphasis added); *Cotati Alliance for Better Housing* v. *City of Cotati,* 148 Cal.App.3d 280, 286, fn. 5 (1983), citing *Birkenfeld* ("[C]ourts may review the facial validity of a rent control ordinance for *possible* confiscatory effects *before* the ordinance has been allowed to become operative and actual rent ceilings imposed."). *See also Calfarm Ins. Co.* v. *Deukmejian,* 48 Cal. 3d 805, 819 (1989) ("The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. . . ."); *Bayscene Resident Negotiators* v. *Bayscene Mobilehome Park*, 15 Cal.App.4th 119, 134 (1993), citing *Birkenfeld*, and holding that the compulsory arbitration scheme in question "must "provide [ ] . . . [mobile home] park owners with a 'just and reasonable return on their property.'").

115.   In depriving WGA members thrust into MMC, including Olive Hill, of the rights described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

116.   An actual and substantial controversy exists between Olive Hill and the Board regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

117.   Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

### THIRD CAUSE OF ACTION

### VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

**(Unlawful Delegation)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

**A.      The MMC Statute's Delegation Of Coercive State Power To A Private, Self-Interested Union Violates Due Process Of Law.**

118.   Plaintiffs incorporate by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

119.   "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

120.   42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

121.   In depriving WGA members thrust into MMC, including Olive Hill, of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

122.   Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

123.   Under the MMC Statute, the union – not the State of California – decides whether, when, and which employer it will target for forced contracting.

The ALRB operates without any discretionary decision-making or control over the union's targeting. Its role in "referring" an employer into MMC requires nothing more than to confirm that 90 days have elapsed since the union's initial request to bargain. The MMC Statute "abdicate[s] effective state control over state power [to] private parties, serving their own private advantage, [who] may unilaterally invoke state power" over another private party. *Fuentes* v. *Shevin*, 407 U.S. 67, 69-70 (1972).

124.    In *Fuentes*, the Supreme Court struck down the delegation of regulatory authority to private parties – that case involved state power to replevy goods from another – as a violation of the Due Process Clause: "No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark." *Ibid.*

125.    There is nothing novel about the *Fuentes'* due process rationale undergirding the U.S. Supreme Court's "private nondelegation" doctrine. It has been applied in myriad cases, all having one thing in common: it is anathema to due process to allow a private, self-interested party to wield governmental authority over the property or liberty interests of another private individual. In the context of industrial regulation, a "majority" of industry participants "whose interests may be and often are adverse to the interests of others in the same business" may not "regulate the affairs of an unwilling minority." *See Carter* v. *Carter Coal Co.*, 298 U.S. 238, 311 (1936). Regarding zoning decisions, a legislature may not delegate a power to some property owners to "virtually control and dispose of the property rights of others" when they can "do so solely for their own interest." *Eubank* v. *City of Richmond*, 226 U.S. 137, 143–44 (1912); *see also Roberge*, 278 U.S. at 121–22. A creditor may not simply freeze a debtor's wages or seize his goods without making some showing before a judge. *See Sniadach* v. *Family Finance Corp. of Bay*

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   *View*, 395 U.S. 337 (1969); *N. Ga. Finishing, Inc.* v. *Di-Chem, Inc.*, 419 U.S. 601,

2   606–07 (1975).[20]

3       126.   "These opinions still stand for the proposition that a legislative body

4   may not constitutionally delegate to private parties the power to determine the

5   nature of rights to property in which other individuals have a property interest,

6   without supplying standards to guide the private parties' discretion." *General Elec.*,

7   936 F.2d at 1455 ("Otherwise, "administrative decision-making [will be] made

8   potentially subservient to selfish or arbitrary motivations or the whims of local

9   taste.") (citation and quotations omitted).

10      127.   Most recently, the Supreme Court reaffirmed the rule in the context of

11  landlord-tenant law. *See Chrysafis* v. *Marks*, 141 S.Ct. 2482 (2021) (tenant may not

12  unilaterally prevent eviction by self-certifying financial hardship, where the landlord

13  has no access to a hearing to contest that certification). The due process violation in

14  each of these cases involved vesting self-interested, private actors with unfettered

15  and unreviewable power while divesting the government of any residual discretion

16  over how that power may be invoked.

17      128.   A state may not delegate power of decision to individuals who "are not

18  bound by any official duty, but are free to withhold consent for selfish reasons or

19  arbitrarily," *Roberge*, 278 U.S. at 122, because it incentivizes self-interested persons

---

20  [20] Although the Supreme Court was "given the opportunity in [*City of Eastlake* v.

21  *Forest City Enterprises, Inc.*, 426 U.S. 668 (1976)] to overrule the *Lochner*-era

22  cases of *Eubank* and *Roberge,* the Court chose instead to distinguish them," noting

23  that these cases "involved delegations by 'the legislature to a *narrow segment* of the community, not to the people at large.'" *Silverman* v. *Barry*, 727 F.2d 1121, 1126

24  (D.C. Cir. 1984) (citing *City of Eastland*, *supra* at 677); accord *Rice* v. *Vill. of Johnstown, Ohio*, 30 F.4th 584, 589 (6th Cir. 2022) ("The Court has never

25  overruled *Eubank* or *Roberge.* And these cases have made occasional appearances in

26  the Court's later opinions."); *Boerschig* v. *Pipeline*, 872 F.3d 701, 707 (5th Cir.

27  2017), citing *General Elec.*, 936 F.2d at 1455 ("Although this so-called 'private nondelegation' doctrine has been largely dormant in the years since, its continuing

28  force is generally accepted.").

1   "to seek personal gain by placing arbitrary conditions on the liberty of their

2   adversaries. " *Texas* v. *United States*, 300 F. Supp. 3d 810, 843 (N.D. Tex. 2018),

3   *rev'd on other grounds, Texas* v. *Rettig*, 987 F.3d 518 (5th Cir. 2021). This is "a

4   situation where the Legislature has delegated authority to the very individuals who

5   are to be the subject of the regulations." *Antoine* v. *Department of Public Health,* 33

6   Cal.App.3d 215, 227-28 (1973)*. See also Department of Transportation* v. *Ass'n of*

7   *American Railroads,* 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("When it comes

8   to [a legislative delegation to] private entities, however, there is not even a fig leaf

9   of constitutional justification."). Put another way, "nothing opens the door to

10  arbitrary action so effectively as to allow those officials to pick and choose only a

11  few to whom they will apply legislation," *Railway Express Agency*, 336 U.S. at 112

12  – except perhaps where that official power is wielded by a private, self-interested

13  union against an employer.

14          129.   Under MMC, the mediator fixes the terms of the MMC "agreement."

15  The Board may review them, within the narrow parameters allowed by the MMC

16  Statute. But *no one* – other than the union triggering the compulsory arbitration

17  process – gets to decide whether, when, and which employers will be compelled into

18  MMC. Once that happens, the employer has no avenue to avoid the coercive results

19  of this process. Because bargaining to an agreement is no longer consensual, the

20  employer cannot refuse to accede to terms, or engage in other, permitted tactics in

21  any arms-length negotiation. *See NLRB* v. *Insurance Agents' International Union*,

22  361 U.S. 477, 487–489 (1960) (employers and unions in collective bargaining

23  "proceed from contrary and to an extent antagonistic viewpoints and concepts of

24  self-interest. . . . The presence of economic weapons in reserve, and their actual

25  exercise on occasion by the parties, is part and parcel of the system that the Wagner

26  and Taft-Hartley Acts have recognized."). Although the employer can walk out of

27  "negotiations," this will not forestall the arbitral decree. A contract will be imposed,

28  regardless of whether the employer participates in the process. *See* Regs., §

-50-

20407(a)(1) ("The failure of any party to participate or cooperate in the mediation and conciliation process shall not prevent the mediator from filing a report with the Board that resolves all issues and establishes the final terms of a collective bargaining agreement, based on the presentation of the other party.").

130.    An administrative agency may subdelegate to private entities so long as the entities "function subordinately to" the administrative agency and the agency "has authority and surveillance over [their] activities." *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U.S. 381, 399 (1940). But here, the ALRB has no say-so whatsoever as to which employer will be subjected to the coercive power of the State, leaving open the risk of a collusive arrangement between a union and a competitor of the farmer targeted for MMC.

131.    Second, the forced contract enriches and entrenches the union, allowing it to invoke the power of the State to force farmworkers to choose between losing their jobs and remitting a portion of their salary in agency fees, while barring a decertification election until the end of the term of the MMC contract. The conflict of interest is made more palpable by the inability of the farmworkers to ratify that "agreement," or to participate (or even observe) the process triggered by the union's demand.

132.    In depriving WGA members thrust into MMC, including Olive Hill, of the rights described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

133.    An actual and substantial controversy exists between WGA members, including Olive Hill, and the Board regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying

and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

134.  Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

**FOURTH CAUSE OF ACTION VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

**(Role of the Mediator)**

**(Against All Defendants)**

**(42 U.S.C. §1983)**

135.  Plaintiffs incorporate by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

136.  "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

137.  42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

138.  In depriving WGA members thrust into MMC, including Olive Hill, of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

139.  Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

A.    **MMC Impermissibly Combines "Mediation" And "Adjudication" Functions In One Decision-Maker.**

140.    Under MMC, a party is forced to submit to a hybrid mediation/arbitration process in which the decision-maker is expected to engage in "off-the-record" or *ex parte* settlement communications and then adjudicate the dispute. The coercive, hybrid process violates due process.

141.    The fairness of mediation is predicated on the voluntary nature of the process, *Travelers Casualty and Surety Co.* v. *Superior Ct.*, 126 Cal. App. 4th 1131, 1140 (2004), and the absolute inadmissibility of communications made in the course of mediation. Cal. Evid. Code §§1119, 1121*; see also Cassel* v. *Superior Court,* 51 Cal.4th 113, 118-19 (2011). The Evidence Code's mediation confidentiality provisions are "clear and absolute," and bar the discoverability or admissibility "'in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which . . . testimony can be compelled to be given,'" of anything spoken or written in connection with the mediation proceeding. *Cassel*, 51 Cal.4th at 117-18 (quoting Cal. Evid. Code § 1119 (a), (b)). These provisions "must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected." *Id*. at 118.

142.    During MMC, the mediator engages in "off-the-record" discussions whereby the parties share their best offers to settle the dispute voluntarily, whether during plenary mediation sessions or via *ex parte* communications. All off-the-record MMC communications are subject to the mediation confidentiality protections. *See* Regs., § 20407(a)(2) ("All communications taking place off the record shall be subject to the limitations on admissibility and disclosure provided by Evidence Code section 1119(a) and (c), and shall not be the basis for any findings and conclusions in the mediator's report."). At the same time, the mediator is required to obtain "on-the-record" evidence in an arbitration setting, where the

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

parties present their conflicting positions as to critical terms and conditions of the CBA.

143.    To be sure, parties may *choose* to engage in settlement discussions with the judge presiding over their dispute. Under MMC, the employer's consent is not required. MMC compels the employer into a different choice: Refuse to participate (and have the mediator impose terms proposed by the union, *see* Regs., § 20407(a)(1)), or participate involuntarily in the MMC's hybrid mediation/arbitration process (without consenting to the admixture of both roles in the same person).

144.    This undermines the neutrality of the decision-maker and the decision-making process. *First*, it creates the inherently coercive dynamic whereby a party understands that the mediator may compel terms not agreed to by either party. This "settle, or else" dynamic infects the entire process, whereby a party is, in effect, coerced into making concessions for fear that the adjudication of the same term may yield a worse result.

145.    *Second*, the purpose of the mediator's privilege is to insulate the decision-maker from learning the parties' private settlement positions. But the MMC process inverts these protections by creating a structurally biased procedure whereby the mediator **is** the decision-maker who obtains privileged communications, and then adjudicates any terms still in dispute. It is not possible for the mediator to banish all recollection of those off-the-record communications in resolving disputed issues and fixing contract terms. Whatever the mediator learns "off-the-record" has the danger, and certainly the appearance, of biasing the mediator's determination of the provisions of the "agreement."

146.    *Third*, in arbitrations as well as judicial proceedings, *ex parte* communications are presumed to inject bias into the decision-making process, and are to be avoided. *See* Cal. R. Ct. 3.820(b); *Maaso* v. *Singer,* 203 Cal.App.4th 362, 375 (2012) (affirming vacating an arbitration award based on *ex parte* communications between the neutral arbitrator and the party arbitrator, holding that

such communications "undermine the fairness and integrity of the arbitration process"). Yet MMC allows and encourages *ex parte* communications, thus violating fair process and creating an appearance of bias, whether or not prohibited under regulations. *See Sangamon Valley Television Corp.* v. *United States,* 269 F.2d 221, 224 (D.C. Cir. 1959).

B.    **The MMC Statute Precludes Admissibility Or Judicial Review Of "Off-The-Record" Or *Ex Parte* Mediation Communications.**

147.    Judicial review presumes the ability of the parties to present, and the court to consider, the substantive communications in the underlying proceeding. The same holds true in agency proceedings. For example, under the Rule 1.1 of the California Public Utilities Commission's Rules of Practice and Procedure, the PUC may impose penalties or issue orders to ensure the integrity of the formal record and to protect the public interest when an *ex parte* violation has been found. *See* Cal. Pub. Util. Code §§ 701, 2107, 2108.

148.    When an administrative adjudicator uses "evidence" outside the record there is a denial of a fair hearing. As to that "evidence," there has been no hearing at all. *Cf. Morgan* v. *United States*, 304 U.S. 1 (1938) (right to a hearing denied where Secretary of Agriculture fixed maximum rates to be charged by stock yard market agencies in reliance on evidence taken by investigating personnel, with whom the Secretary conferred *ex parte*, accepted their recommendations, and issued an order, without allowing plaintiff to challenge the evidence.). If a trial-type hearing of the sort mandated by MMC is required by due process of law – clearly this is the case, given that the mediator's report "shall include the basis for the mediator's determination [and] shall be supported by the record," Lab. Code § 1164(d) – such review is impossible where the record does not disclose the evidence and communications that may have influenced the mediator's decision. *See United Steelworkers of Am.* v. *Marshall* (D.C. Cir. 1980) 647 F.2d 1189, 1215 (noting "general concern that whenever the record fails to disclose important

communications that may have influenced the agency decision maker, the court cannot fully exercise its power of review").

149.    But under MMC, "off-the-record" communications are subject to the limitations on admissibility and disclosure, *see* Cal. Evid. Code §1119(a)-(c), and "shall not be the basis for any findings and conclusions in the mediator's report." *See* Regs., 20407(a)(2). These communications are obviously not a part of the record that may be reviewed in evaluating a "mediator's" decision. They are "absolutely" barred from any discovery.[21] Cross-examination of the mediator is prohibited under the Board's regulations. *See* Regs., § 20407(a)(2); *see also Hess Collection Winery,* 29 ALRB No. 6 at 7 (2003). It is also foreclosed by "simple notions of due process," since the mediator cannot defend himself without violating the mediation confidentiality statutes. *Cf. Solin* v. *O'Melveny & Myers,* 89 Cal.App.4th 451, 463, 467 (2001) (dismissing malpractice action which could not be resolved without breaching the attorney-client privilege).

150.    Accordingly, once rendered the mediator's decision is effectively immunized from a challenge based on the (mis)use of confidential information, or the failure to consider relevant (albeit confidential) information, in reaching his decision. This leaves the aggrieved party with no practical means to overturn the findings of the mediator, and no ability of the court to conduct any judicial review of communications immunized from discovery or admissibility.

151.    In depriving Plaintiffs of the rights described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

152.    An actual and substantial controversy exists between Plaintiffs and the Board regarding the pending MMC process. The controversy is of sufficient

---

[21] The MMC Statute does not contain any "express statutory exception" to Cal. Evid. Code § 1119 that would permit a court to obtain a communication protected by the mediator's privilege. *Cassel*, 51 Cal.4th at 124.

immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

153.    Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION

**(Requirement of Parties to Pay MMC Mediation Costs)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

**A.     The MMC Statute Violates Due Process By Requiring "Parties" To Bear Half The Costs Of A Compelled Contracting Process.**

154.    Plaintiffs incorporate by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

155.    "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, §1.

156.    42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

157.   In depriving Olive Hill (and other WGA members thrust into MMC) of these rights, as more fully described below, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

158.   Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

159.   Labor Code section 1164(b) states:

Upon receipt of a declaration pursuant to subdivision (a), the board shall immediately issue an order directing the parties to mandatory mediation and conciliation of their issues. The board shall request from the California State Mediation and Conciliation Service a list of nine mediators who have experience in labor mediation. The California State Mediation and Conciliation Service may include names chosen from its own mediators, or from a list of names supplied by the American Arbitration Association or the Federal Mediation Service. The parties shall select a mediator from the list within seven days of receipt of the list. If the parties cannot agree on a mediator, they shall strike names from the list until a mediator is chosen by process of elimination. If a party refuses to participate in selecting a mediator, the other party may choose a mediator from the list. ***The costs of mediation and conciliation shall be borne equally by the parties.***

160.   The MMC process is not a matter of consensual agreement. It is a compelled contracting process, whereby upon demand by an agricultural employer or a certified labor organization, the Board shall "immediately issue an order directing the parties to mandatory mediation and conciliation of their issues." An employer which has no desire or intention to invoke this process is ordered into this

process. Whether or not the employer chooses to participate in the choice of mediator, or to even participate in the MMC process itself, a contract shall be imposed.

161.    Under Labor Code section 1164(d), the mediator, acting as an arbitrator, "resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process." The mediator also determines the "entire economic value of the collective bargaining agreement" if the parties are unable to agree. Lab. Code § 1164(d).

162.    The statute requires the "parties" to each bear one-half of the costs of mediation and conciliation. The statute makes no allowance based on financial need, the costs of the mediator's hourly fees, or other expenses incurred.

163.    The State may not require a party compelled into a state legal proceedings by order of the State to pay for one-half the public costs of a mediator, who is also imposed by force of law. *California Teachers Assn.* v. *State of California* (1999) 20 Cal.4th 327, 354-55, 357 (invalidating provision requiring dismissed or suspended public teachers to pay for one-half the public cost of the administrative law judge as in "total and fatal conflict with controlling constitutional principles and is invalid on its face.")

164.    In depriving Olive Hill (and similarly situated members of WGA) of its due process rights, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

165.    An actual and substantial controversy exists between Plaintiffs regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue

involved, and the judgment will finalize the controversy and offer relief from uncertainty.

166.   Labor Code section 1164(b) should therefore be declared unconstitutional on its face in violation of Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE**

**FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION**

**(Compulsory Arbitration)**

**(Against All Defendants)**

**(42 U.S.C. § 1983)**

**A.     The MMC Statute Violates Equal Protection By Empowering A Self-Interested Union To Compel Individualized And Arbitrary Distinctions By The State Among Similarly Situated Employers.**

167.   Plaintiffs incorporates by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

168.   The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

169.   42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

170.   In depriving Olive Hill (and similarly situated members of WGA) of these rights, as more fully described below, Defendants acted under color of state

1  law. This deprivation under color of state law is actionable under and may be

2  redressed by 42 U.S.C. § 1983.

3       171.   Labor Code section 1164 *et seq.* should therefore be declared

4  unconstitutional on its face in violation of the Equal Protection Clause under the

5  Fourteenth Amendment to the U.S. Constitution.

6       172.   The core of equal protection is equal treatment — those that are

7  similarly situated shall be treated similarly. The corollary is that the state cannot

8  "pick and choose" only a few to whom it will apply legislation. Both principles are

9  violated by the MMC Statute: *first*, by empowering a self-interested union to compel

10 the regulation of individual employers of its choosing; and *second*, by requiring a

11 private mediator to draw individualized classifications that have no rational

12 relationship to the statute's purpose.

13      173.   A private MMC mediator is not a judge or elected official, but acts in

14 every practical aspect as a quasi-legislator or quasi-judicial officer in fixing the

15 terms of the MMC contract, subject only to a highly deferential standard of

16 administrative and judicial review. A private union is not a prosecutor. But, just as a

17 prosecutor can choose his defendants, here a union can decide, whether for reasons

18 of expediency, profit, or punitive intent, to target a weak employer (with fewer

19 employees) or a successful employer (with many employees). The union has

20 unilateral power to decide which employer will be targeted (some perhaps never), or

21 when, opening the door to collusive arrangements *between* the union and the

22 employer, to the detriment of employees who otherwise would never ratify a

23 consensual CBA imposing agency fees.

24      174.   A legislative body may adopt laws of a "less than comprehensive

25 fashion by merely 'striking the evil where it is felt most,'*[but] its decision as to*

26 *where to 'strike' must have a rational basis in light of legislative objectives. Hays* v.

27 *Wood*, 25 Cal.3d 772, 791 (1979) (emphasis added). The MMC Statute provide no

28

1  guidance as to "where to strike," in terms of the targeting of a specific employer,
2  leaving that decision entirely to the union.

3      175.   The California Supreme Court, in essence, concluded in *Gerawan I* that
4  the statutory purpose is to allow the mediator to make individualized, discretionary
5  decisions, and on that basis, any decision is rationally related to that purpose, so
6  long as it is "supported by the record," meaning that the mediator was able to point
7  to other, "typical" terms or provisions in another CBA submitted as evidence,
8  regardless of the other trade-offs involved in any consensual, arms-length, labor
9  contract negotiation.

10     176.   But reducing rational basis scrutiny to such a tautology violates equal
11 protection by necessitating that individuals, all similarly situated with respect to the
12 statute's aim, be treated distinctly. What results from this process is "special
13 legislation" without any rational basis to distinguish why this employer was singled
14 out, why the differences or similarities as to its business justify treating it differently
15 from other employers, or how such distinctions were made. This is, as the California
16 Court of Appeal held (before being reversed), "'the very antithesis of equal
17 protection.'"

18     177.   A statute violates equal protection if it "intentionally treated [one
19 individual] differently from others similarly situated and[] there is no rational basis
20 for the difference in treatment." *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564
21 (2000). Such an equal protection claim can give rise to a facial constitutional
22 violation where the disparate treatment is "occasioned by express terms of a
23 statute." *Ibid.*; *see also Gerhart* v. *Lake Cnty., Mont.*, 637 F.3d 1013, 1022 (9th Cir.
24 2011). While evidence of unequal or arbitrary application (present here) certainly
25 supports a finding that a statute facially violates equal protection, if a statute "lays
26 down no rule by which its impartial execution can be secured or partiality and
27 oppression prevented," and thereby allows arbitrary distinctions to be drawn, it
28 necessarily violates equal protection. *See, e.g., Yick Wo* v. *Hopkins*, 118 U.S. 356,

370, 372-73 (1886) (licensing decisions must be based on established standards, rather than upon the whim or caprice of the licensor).

178.   For purposes of equal protection analysis, the relevant classification is comprised of any employer where the union has been certified to represent the bargaining unit. The distinction within that class as to which employers will be subjected to MMC is left entirely to the discretion of the union. While it is beyond dispute that California has the authority to regulate employment, *see Schaezlein* v. *Cabaniss*, 135 Cal. 466 (1902), the Legislature may not leave "the question as to whether or how these things shall be done or not done to the arbitrary disposition of [an] individual," *id*., at 470, particularly where that individual is neither disinterested nor accountable for his decisions. The manner by which the MMC Statute permits the targeting of one employer is a perfect example of an instance where the individual has been irrationally singled out from other, similarly situated employers.

179.   It is these specific distinctions as to how similarly situated persons are treated, and not the legislative device of compulsory arbitration in the abstract, that must be rationally related to the legislative goals. *Gerhart*, 637 F.3d at 1022. In *Gerhart*, the Ninth Circuit explained that the district court had made a "crucial error in its analysis of the rational basis requirement" by misconstruing for what there must be a rational basis. The court explained that it was not the legislative act — in that case, denying Gerhart's construction permit application — that must be justified as rational, but rather the decision to "treat[] Gerhart differently" than similarly situated individuals under the statute. *Id*. at 1023; *see also Hodel* v. *Indiana*, 452 U.S.314, 332 (1981). The only conceivable rationale for the distinction drawn between otherwise similarly situated employers within the statute's classification is an irrational and illegitimate one.

180.   Even where rational basis review applies, justifications for legal discrimination "must find some footing in the realities of the subject addressed by

the legislation. *Heller* v. *Doe*, 509 U.S. 312, 321 (1993). The only stated purpose of the MMC Statute is to promote stability in bargaining relationships and foster collective bargaining. But the objective of imposing ***some*** CBA on ***some*** employers is accomplished no matter ***which*** employer a union chooses to compel into MMC, and no matter ***what*** terms the mediator ultimately supplies. The imposition of ***any*** individual term of a CBA on a particular employer, then, is not rationally related to the statute's purpose — *all* terms, whatever their content, would be equally related to the statutory goal of imposing ***some*** CBA.

181. Based on this statutory objective, the statute might plausibly differentiate between those employers with an existing CBA and those without — treating those classes of employers distinctly may bear a rational relationship to the statutory purpose of promoting collective bargaining. But even within that class, the statute does not discriminate rationally. The only difference between Olive Hill and those employers not forced into MMC is that the union chose Olive Hill (and similarly situated members of WGA), for reasons that the statute ***does not*** consider, and the ALRB ***may not*** consider

182. As the California Court of Appeal explained in *Gerawan Farming*, "[B]ecause the mediator has no power to extend the enactment [of a CBA] to other agricultural employers," each regulated employer forms a "class of one," without any means to insure the differences or similarities between contracts bear a rational relationship to the statutory purpose. *Id.,* 187 Cal. Rptr. 3d at 293. It is not the potential for an individuated outcome, but the <u>certainty</u> that each employer will be subjected to an individual legislative act, which makes the classification intentional. It is the <u>lack</u> of any nexus between the statutory purpose and the distinctions drawn by any individual mediator which makes the classification arbitrary. *See Barsky* v. *Bd. of Regents of Univ.*, 347 U.S. 442, 470 (1954) (finding constitutional violation where "a State licensing agency lays bare its arbitrary action, or if the State law explicitly allows it to act arbitrarily").

183.   The California Supreme Court believes that the mediator is guided by various statutory factors that ensure that similarly situated individuals will be treated alike. *See* Lab. Code § 1164(e) (listing "factors commonly considered in similar proceedings"). These are not standards at all. It is impossible to replicate bargaining (because the mediator cannot understand, based on his review of "comparable" CBAs, the trade-offs that were made as part of a consensual negotiation); he cannot find any equivalence for a fair adjustment of dozens of competing terms in any agreement.

184.   Because the statute does not pass any judgments as to the sort of terms that would foster collective bargaining and stability, a mediator could consider one employer's wages with relation to "comparable firms" and choose to impose a wage increase, a wage decrease, or no change at all, with equal justification.

185.   It is no answer to argue that, by design, the MMC Statute requires the mediator to make subjective, individualized determinations; disparate treatment is to be expected, because no two employers are alike. The MMC Statute's lack of an independent purpose cannot be rescued by analogy to the exercise of prosecutorial or administrative enforcement discretion. This argument fails for the same reason the MMC Statute suffers from a basic constitutional defect: it provides only arbitrary classifications. The State cannot simultaneously argue that the MMC Statute affords adequate guiding standards to the mediator <u>and</u> that it is intended to enable subjective determinations that are insulated from rational basis review. *See Merrifield* v. *Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) ("We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold Merrifield's exclusion from the exemption based on a completely contradictory rationale.").

186.   In depriving Olive Hill (and similarly situated members of WGA) of due process under the law, Defendants acted under color of state law. This

deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983.

187.   An actual and substantial controversy exists between Plaintiffs and the Board regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

188.   Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process Clause under the Fourteenth Amendment to the U.S. Constitution.

## SEVENTH CAUSE OF ACTION

## FOR DECLARATORY AND INJUNCTIVE RELIEF

### (Against All Defendants)

### (28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983)

189.   Plaintiffs incorporates by reference and realleges each allegation set forth in Paragraphs 1 through 82 above.

190.   Plaintiffs desire a judicial determination of its rights, the Board's duties, and the constitutionality of the mandatory mediation and conciliation procedures under Labor Code section 1164 *et seq.*, including that part of section 1164(b) relating to the payment of the cost of mediation and conciliation.

191.   A declaration is necessary and appropriate at this time so that Plaintiffs and the Board may be relieved from the uncertainty and insecurity giving rise to this controversy. A proper remedy to challenge an unconstitutional statute or regulation is an action for declaratory and injunctive relief.

192.   Notwithstanding anything to the contrary under law, an injunction may be granted to prevent the execution of a public state statute, by officers of the law,

where the statute violates the U.S. Constitution. *See e.g., Ex parte Young,* 209 U.S. 123 (1908); *Citizens Comm. for Hudson Valley* v. *Volpe*, 297 F. Supp. 809, 814 (S.D.N.Y. 1969).

193.   In depriving Olive Hill (and similarly situated members of WGA) of due process and equal protection under the law, Defendants acted under color of state law. This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. § 1983 by, *inter alia*, a temporary and permanent injunction restraining the enforcement of the MMC Statute. As such, Plaintiffs have stated a cause of action under section 1983.

194.   An actual and substantial controversy exists between Plaintiffs and the Board regarding the pending MMC process. The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. This Court should exercise its discretion to issue a declaratory judgment because the declaratory judgment will serve a useful purpose in clarifying and settling the legal issue involved, and the judgment will finalize the controversy and offer relief from uncertainty.

195.   Pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, Labor Code section 1164 *et seq.* should therefore be declared unconstitutional on its face in violation of the Due Process and Equal Protection Clauses under the Fourteenth Amendment to the U.S. Constitution.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.    An order declaring that the Defendants violated Olive Hill's rights protected under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C. § 1983 by enforcing the MMC Statute against Olive Hill, and declaring that Labor Code section 1164 *et seq.* is unconstitutional on its face.

2.    An order preliminarily and then permanently enjoining Defendants and their agents and all other persons or entities in active concert or privity or participation with them, from enforcing Labor Code section 1164 *et seq.*

3.    An entry of judgment for Olive Hill for nominal damages of $1 against Defendants in their individual capacities;

4.    An award to Plaintiffs of reasonable attorneys' fees and costs incurred in connection with this action from Defendants under 42 U.S.C. §§ 1983 and 1988, California Code of Civil Procedure section 1021.5, and any other relevant provision of law.

5.    For such other and further relief as this court deems just and proper.

Dated: April 4, 2025

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
BARSAMIAN & MOODY

By          */s/ David A. Schwarz*
            DAVID A. SCHWARZ

Attorneys for Plaintiffs

## **VERIFICATION**

I, Denise Godfrey am Manager of Olive Hill Greenhouses, Inc., the Petitioner and Plaintiff herein. I have read the foregoing Verified Petition and Complaint and know the contents thereof. The facts alleged therein are true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the law that the foregoing is true and correct.

Executed on this 4th day of April 2025, in California.


/s/ Denise Godfrey (original signature
retained by attorney David Schwarz)

SMRH:4897-0285-1624.7 VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## **VERIFICATION**

I, Jason Resnick am Sr. Vice President and General Counsel of Western Growers, the Petitioner and Plaintiff herein. I have read the foregoing Verified Petition and Complaint and know the contents thereof. The facts alleged therein are true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the law that the foregoing is true and correct.

Executed on this 4th day of April, 2025, in California.

/s/ Jason Resnick (original signature retained by attorney David Schwarz)