1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    WONDERFUL NURSERIES LLC, et al.,        Lead Case No.  1:24-cv-01601-KES-CDB

11                   Plaintiffs,              Member Case No.  1:25-cv-00577-KES-CDB

12           v.

13    AGRICULTURAL LABOR RELATIONS            ORDER DENYING PLAINTIFFS WESTERN
      BOARD, et al.,                          GROWERS ASSOCIATION AND OLIVE
14                                            HILL GREENHOUSES, INC.'S MOTION
                      Defendants.             FOR A PRELIMINARY INJUNCTION
15

16

17          This matter is before the Court on the motion for a preliminary injunction filed by

18    plaintiffs Western Growers Association ("WGA") and Olive Hill Greenhouses, Inc. ("Olive Hill")

19    on April 24, 2025.  (Doc. 13.)[1]  Plaintiffs seek to enjoin the California Agricultural Labor

20    Relations Board and several of its members, officers, and personnel (collectively "ALRB

21    defendants") from enforcing California Labor Code section 1164 *et seq*., also known as the

22    mandatory mediation and conciliation ("MMC") provisions of California's Agricultural Labor

23    Relations Act ("ALRA").  (*Id.* at 2.)  The United Farm Workers of America ("UFW")—whose

24    motion to intervene as a defendant in this action was granted on May 20, 2025, (Doc. 32)—and

25    the ALRB defendants both oppose plaintiffs' motion.  (Docs. 19-2, 26.)  For the reasons

26    explained below, plaintiffs' motion is denied.

27    _____

28    [1] All docket citations are to docket entries in 1:25-cv-0577-KES-CDB.

                                                    1

1    **BACKGROUND**

2    **A.    The MMC Statutory Framework**

3    The California Agricultural Labor Relations Act of 1975 was enacted "to encourage and

4    protect the right of agricultural employees to full freedom of association, self-organization, and

5    designation of representatives of their own choosing, to negotiate the terms and conditions of

6    their employment, and to be free from the interference, restraint, or coercion of employers of

7    labor." *Gerawan Farming, Inc. v. ALRB*, 3 Cal. 5th 1118, 1129 (2017) (quoting Cal. Lab. Code

8    § 1140.2). It "established an elaborate framework governing the right of agricultural workers to

9    organize themselves into unions to engage in collective bargaining with their employers" and

10   created the ALRB, granting it "specific powers and responsibilities of administration, particularly

11   in conducting and certifying elections and in investigating and preventing unfair labor practices."

12   *Id.* at 1129–30 (citations omitted).

13   Individuals employed as agricultural laborers are exempt from the protections of the

14   National Labor Relations Act, *see* 29 U.S.C. § 152(3), so "[i]n enacting the ALRA, the

15   [California] Legislature intended to fill [that statutory] gap" to recognize, among other things,

16   "the right of agricultural employees to organize themselves into unions and to engage in

17   collective bargaining, free from intimidation by either employers or union representatives."

18   *Gerawan*, 3 Cal. 5th at 1131 (citations omitted). However, it subsequently "became clear that the

19   ALRA had not resulted in the widespread adoption of collective bargaining agreements between

20   agricultural employers and employees." *Id.* at 1132 (recognizing "that in 2002, agricultural

21   employers had not agreed to a contract in about 60 percent of the cases where a labor union had

22   been certified."). Therefore, the MMC provisions were added to the ALRA "in order to ensure a

23   more effective collective bargaining process between agricultural employers and agricultural

24   employees." Cal. Stats. 2002, ch. 1145, § 1 (S.B. 1156).

25   The MMC process set forth in section 1164 of the California Labor Code is a form of

26   compulsory interest arbitration. *Gerawan*, 3 Cal. 5th at 1133. "Unlike 'grievance arbitration,'

27   which focuses on 'construing the terms of an existing agreement and applying them to a particular

28   set of facts,' interest arbitration 'focuses on what the terms of a new agreement should be.'" *Id.*

1  (quoting *Loc. 58, Int'l Bhd. of Elec. Workers, AFL-CIO v. Se. Michigan Chapter, Nat. Elec.*

2  *Contractors Ass'n, Inc.*, 43 F.3d 1026, 1030 (6th Cir. 1995)).  MMC is not quasi-judicial, *see*

3  *Hess Collection Winery v. Agric. Lab. Rels. Bd.*, 140 Cal. App. 4th 1584, 1598 (2006), but rather,

4  "results in 'quasi-legislative action' by which '[t]he terms of the "agreement" determined by the

5  arbitrator [are] imposed upon [the employer] by force of law."  *Gerawan*, 3 Cal. 5th at 1133

6  (alternations in original) (quoting *Hess*, 140 Cal. App. 4th at 1597).

7       If, as in this case, the labor organization was certified after January 1, 2003, either it or the

8  agricultural employer may file with the ALRB a request for MMC any time following 90 days

9  after an initial request to bargain.  Cal. Lab. Code § 1164(a).  The filing party must submit a

10  declaration stating that the parties are subject to an existing certification, that they have failed to

11  reach a collective bargaining agreement, and that the employer has employed 25 or more

12  agricultural employees during any calendar week in the year preceding the filing of the

13  declaration and request for MMC.  Cal. Code Regs. tit. 8, § 20400(b)

14       If these regulatory and statutory requirements have been satisfied, the ALRB "shall

15  immediately issue an order directing the parties to" MMC before an experienced, neutral, and

16  mutually selected mediator.  Cal. Lab. Code § 1164(b).  At the request of the ALRB, a list of nine

17  mediators is supplied by the California State Mediation and Conciliation Service which "may

18  include names chosen from its own mediators, or from a list of names supplied by the American

19  Arbitration Association or the Federal Mediation Service."  *Id.*  If the parties cannot agree on a

20  mediator, they strike names from the supplied list until one is chosen by process of elimination.

21  *Id.*  If one party refuses to participate in the selection process, the mediator may be selected by the

22  other party.  *Id.*  "The costs of mediation and conciliation [are] borne equally by the parties."  *Id.*

23       Mediation proceeds for 30 days, with the option to extend for an additional 30 days.  Cal.

24  Lab. Code § 1164(c).  The parties present their issues to the mediator, who takes evidence and

25  hears argument in recorded proceedings but retains discretion to go off the record to clarify or

26  resolve issues informally.  Cal. Code Regs. tit. 8, § 20407(a).  If the parties fail to reach a

27  mutually satisfactory resolution, the mediator certifies that the mediation process has been

28  exhausted.  Cal. Lab. Code § 1164(c).  Within 21 days after the mediation period expires the

mediator files a report with the ALRB resolving all issues and establishing "the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process." Cal. Lab. Code § 1164(d). The report must include the basis for the mediator's determination and must be supported by the record, *id.*, but "communications taking place off the record . . . shall not be the basis for any findings and conclusions in the mediator's report." Cal. Code Regs. tit. 8, § 20407. "In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings."[2] Cal. Lab. Code § 1164(e).

Within seven days, either party may seek review of the mediator's report before the ALRB "on the ground that one or more provisions are (1) 'unrelated to wages, hours, or other conditions of employment . . . ,' (2) 'based on clearly erroneous findings of material fact,' or (3) 'arbitrary or capricious in light of the mediator's findings of fact.'" *Gerawan*, 3 Cal. 5th at 1134 (quoting Cal. Lab. Code § 1164.3(a)). If no petition for review is filed or the ALRB declines to accept the petition for review (because a prima facie case of the grounds specified in Cal. Lab. Code § 1164.3(a) was not established), the mediator's report becomes a final order of the ALRB. Cal. Lab. Code § 1164.3(b).

If the ALRB finds grounds to grant review and "determines that a provision of the collective bargaining agreement contained in the mediator's report violates" the provisions of Cal.

---

[2] Such factors include:
> (1) The stipulations of the parties.
> (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands.
> (3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements.
> (4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed.
> (5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed.

Cal. Lab. Code § 1164(e).

Lab. Code § 1164.3(a), it must order the mediator to modify the terms of the collective bargaining agreement, meet with the parties for a subsequent mediation session, and prepare and file a second report with the ALRB.  Cal. Lab. Code § 1164.3(c).  Either party may petition the ALRB for review of the mediator's second report under the same framework as set forth above.  Cal. Lab. Code § 1164.3(d).  If the mediator's second report is subject to review, the ALRB determines the issues and issues a final order.  *Id.*

Either party may also petition the ALRB to set aside the mediator's report if "(1) [it] was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially prejudiced by the misconduct of the mediator."  Cal. Lab. Code § 1164.3(e).  If the ALRB finds that any of these grounds exist, it must vacate the report of the mediator and order an additional mediation period of 30 days under a newly appointed mediator.  *Id.*

The MMC review process is two-tiered.  *Gerawan*, 3 Cal. 5th at 1134.  "Within 30 days after the order of the board takes effect, a party may petition for a writ of review in the court of appeal or the California Supreme Court."  Cal. Lab. Code § 1164.5(a).  Judicial review is limited to determining whether:

> (1) The board acted without, or in excess of, its powers or jurisdiction.
> (2) The board has not proceeded in the manner required by law.
> (3) The order or decision of the board was procured by fraud or was an abuse of discretion.
> (4) The order or decision of the board violates any right of the petitioner under the Constitution of the United States or the California Constitution.

Cal. Lab. Code § 1164.5(b).  Judicial enforcement of the ALRB's final order, or a stay of enforcement pending judicial review may also be sought.  Cal. Lab. Code § 1164.3(f)(1), (3).  An employer that seeks review of the final order must post "a bond with the [ALRB] in the amount of the entire economic value of the contract . . . to ensure that employees or the labor organization receive the economic benefits of the contract if the employer does not prevail."  Cal. Lab. Code § 1164.5(b).  The "entire economic value of the contract" means "the difference between the employees' existing wages and economic benefits and those set forth in the contract."  *Id.*

5

1    Constitutional challenges to the MMC statutory scheme have been raised and rejected by

2    California courts in the past. *See Hess Collection Winery v. Agric. Lab. Rels. Bd.*, 140 Cal. App.

3    4th 1584, 1591 (2006) (rejecting as meritless contentions that MMC process violated principles of

4    due process and equal protection, interfered with right of contract, invalidly delegated legislative

5    authority, and was vague and overbroad). The most recent California Supreme Court decision on

6    this subject reversed a judgement of the Court of Appeal, which had found the MMC statute

7    unconstitutional. *Gerawan*, 3 Cal. 5th at 1130. The California Supreme Court concluded "that

8    the MMC statute neither violates equal protection nor unconstitutionally delegates legislative

9    power." *Id.*

10   **B.    Factual Background**

11   Olive Hill is a family operated "California corporation with agricultural operations in

12   Fallbrook, California" that "specializes in growing indoor tropical plants like Bromeliads,

13   Anthuriums, and foliage plants." (Doc. 1 at ¶ 16.) Olive Hill is a member of WGA, "a nonprofit

14   association representing local and regional family farmers in California, Arizona, Colorado and

15   New Mexico for nearly a century." (*Id.* at ¶ 23.) WGA describes itself as "a leading public

16   policy advocate for the fresh produce industry" with "a longstanding interest in employment and

17   labor matters." (*Id.*)

18   In this lawsuit, WGA and Olive Hill assert a facial constitutional challenge to the MMC

19   provisions on Fourteenth Amendment Due Process and Equal Protection grounds. (*Id.*) The

20   claims set forth in their verified complaint[3] at least in part stem from an ongoing MMC process

21   between Olive Hill and UFW—a labor union which the ALRB certified as the bargaining

22   ///

23

---

24   [3] "A verified complaint or supporting affidavits may afford the basis for a preliminary injunction,
     [unless they] consist largely of general assertions which are substantially controverted by counter-
25   affidavits . . . ." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 691–92 (9th Cir. 2022)
     (alterations in original) (quoting *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088–89 (9th Cir.
26   1972)); *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("A
27   verified complaint may be treated as an affidavit, and, as such, it is evidence that may support
     injunctive relief."), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v.*
28   *Chambers*, 941 F.3d 1195 (9th Cir. 2019).

1   representative for Olive Hill's farmworkers on January 16, 2024.[4]  (*Id.* at ¶¶ 47, 83–195.)  UFW

2   made its initial request to negotiate a collective bargaining agreement with Olive Hill on January

3   26, 2024.  (*Id.* at ¶ 20.)  The parties participated in several bargaining sessions but ultimately

4   failed to reach an agreement.  (*Id.* at ¶ 21.)  On November 12, 2024, UFW filed with the ALRB a

5   request for referral to MMC.  (Doc 1-3 at 2.)  Olive Hill responded that UFW had caused delays

6   by canceling a negotiation session and failing to follow up.  (*Id.* at 3–4.)  Its position before the

7   ALRB was that UFW's request should therefore be denied.  (*Id.*)  The ALRB considered Olive

8   Hill's position but ultimately found in a written order that UFW had met the statutory and

9   regulatory criteria for referral and directed the parties to MMC on November 22, 2024.  (*Id.* at 4–

10  6.)

11          The parties have participated in at least one "off-the-record" confidential mediation

12  session before the selected mediator.  (Doc. 13-2 at ¶ 6.)  So far, no "on-the-record" mediation

13  sessions appear to have been scheduled.  (*Id.*)

14          In their complaint, WGA and Olive Hill assert seven claims under 42 U.S.C. § 1983

15  against the ALRB defendants.  (Doc. 1 at ¶¶ 83–195.)  The first five claims articulate various

16  theories under which the MMC provisions allegedly violate the Due Process Clause of the

17  Fourteenth Amendment:  (1) "Compulsory Arbitration," (2) "Lack of Adequate Safeguards," (3)

18  "Unlawful Delegation," (4) "Role of the Mediator," and (5) "Requirement of Parties to Pay MMC

19  Mediation Costs."  (*Id.* at ¶¶ 83–166.)  The sixth claim alleges that the MMC provisions violate

20  the Equal Protection Clause of the Fourteenth Amendment.  (*Id.* at ¶¶ 167–88.)  Finally, WGA

21  and Olive Hill assert a claim for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201,

22  2202, and 42 U.S.C. § 1983.  (*Id.* at ¶¶ 189–95.)  They seek to recover nominal damages for their

23  claims, a declaratory judgment that the MMC provisions are facially unconstitutional, and "[a]n

24  order preliminarily and then permanently enjoining Defendants and their agents and all other

25  persons or entities in active concert or privity or participation with them, from enforcing

26  [California] Labor Code section 1164 *et seq.*"  (*Id.* at 67–70.)

27  _____

28  [4]  On the date of certification, Olive Hill "employed 79 full-time, direct-hire agricultural
    employees."  (*Id.* at ¶ 19.)

1   **C.    Procedural Background**

2         This lawsuit was originally filed in the Southern District of California.  It was transferred

3   to this Court on May 13, 2025, after WGA and Olive Hill filed a notice of related cases

4   identifying an action pending before the undersigned, *Wonderful Nurseries LLC v. ALRB et al*.,

5   Case No. 1:24-cv-01601-KES-CDB, as a related case.[5]  (Docs. 10, 21.)  WGA and Olive Hill

6   filed the pending motion for a preliminary injunction on April 24, 2025.  (Doc. 13.)  The ALRB

7   defendants filed an opposition to the motion on May 15, 2025.  (Doc. 26.)  On May 1, 2025,

8   while this case was pending in the Southern District of California, UFW filed a motion to

9   intervene as a defendant.  (Doc. 16.)  After the case was transferred, UFW's unopposed motion

10  was granted on May 20, 2025, and its opposition to plaintiffs' motion for a preliminary

11  injunction, (Doc. 19-2), which was docketed in this case on May 9, 2025, was deemed filed.

12  (Doc. 32.)  WGA and Olive Hill filed a reply responding to the ALRB and UFW's oppositions on

13  May 23, 2025.[6]  (Doc. 36.)  A hearing on the motion was held on June 5, 2025.  (Doc. 42.)

14                                  **LEGAL STANDARD**

15        "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

16  *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–

17  90 (2008)).  "A plaintiff seeking a preliminary injunction must establish that he is likely to

18  succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

19  relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

20  *Id.* at 20 (citing *Munaf*, 553 U.S. at 689–90; *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S.

21  531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)).  "Likelihood of

22  success on the merits is a threshold inquiry and is the most important factor."  *Simon v. City &*

23  *Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting *Env't Prot. Info. Ctr. v.*

24  *Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)).  "When, like here, the nonmovant is the government,

25  _____

[5] A separate order is being issued consolidating the related case with the instant case.

26  _____

[6] WGA and Olive Hill also filed evidentiary objections to the declaration of Santiago Avila-
27  Gomez submitted by the ALRB in its opposition to the motion for a preliminary injunction.
    (Doc. 36-1.)  The ALRB filed a response to those objections.  (Doc. 40.)  As this Order does not
28  rely on the declaration of Santiago Avila-Gomez, plaintiffs' evidentiary objections are moot.

8

1    the last two *Winter* factors 'merge.'" *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023)

2    (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th

3    Cir. 2020) (per curiam)). "As a general matter, district courts '*must* consider' all four *Winter*

4    factors." *Id.* (quoting *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 577 (9th Cir. 2014)); *see also*

5    *Benisek v. Lamone*, 585 U.S. 155, 158 (2018); *but see Roe v. Critchfield*, No. 23-2807, 2025 WL

6    1486985, at \*4 (9th Cir. May 23, 2025) ("In the absence of 'serious questions going to the

7    merits,' *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011), the court

8    need not consider the other [*Winter*] factors.").[7]

9    　　　In the Ninth Circuit, "a preliminary injunction may issue where 'serious questions going

10   to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the

11   plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the

12   public interest.'" *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v.*

13   *Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *Cottrell*, 632 F.3d at 1135). This "variant

14   of the *Winter* standard" *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)

15   confirms "that a 'likelihood' of success per se is not an absolute requirement" *Drakes Bay Oyster*

16   *Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2014) (citing *Cottrell*, 632 F.3d at 1131–32) and

17   "reflects [the] circuit's 'sliding scale' approach, in which 'the elements of the preliminary

18   injunction test are balanced, so that a stronger showing of one element may offset a weaker

19   showing of another.'" *Labrador*, 122 F.4th at 844 (quoting *Cottrell*, 632 F.3d at 1131). "[T]he

20   serious questions standard is 'a lesser showing than likelihood of success on the merits.'"

21   *Flathead-Lolo-Bitterroot*, 98 F.4th at 1190 (quoting *Pena*, 865 F.3d at 1217).

22

23   ───────────
     [7]  As the Ninth Circuit has explained, serious questions going to the merits

24   　　　　　are ones "that 'cannot be resolved one way or the other at the hearing
     　　　　　on the injunction' because they require 'more deliberative

25   　　　　　investigation.'" *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir.
     　　　　　2023) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355,
     　　　　　1362 (9th Cir. 1988) (en banc)). They "need not promise a certainty

26   　　　　　of success, nor even present a probability of success, but must
     　　　　　involve a 'fair chance of success on the merits.'" *Marcos*, 862 F.2d

27   　　　　　at 1362 (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517
     　　　　　(9th Cir. 1985)).

28   *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024).

1      A preliminary injunction may issue "only if the movant gives security in an amount that

2  the court considers proper to pay the costs and damages sustained by any party found to have

3  been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

4  **ANALYSIS**

5  **A.**    **Ripeness**

6      As a threshold matter, the ALRB defendants argue that WGA and Olive Hill's claims are

7  not constitutionally ripe because they focus solely on potential future injury from the imposition

8  of a collective bargaining agreement.  The ALRB defendants also argue that the mere referral to

9  MMC is insufficient to establish prudential ripeness.

10      "Along with standing and mootness, ripeness is one of three justiciability requirements."

11  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022).  The doctrine's basic rationale is "to

12  prevent 'premature adjudication' and judicial entanglement in 'abstract disagreements.'"  *Planned*

13  *Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 839 (9th

14  Cir. 2024) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)).

15  "Ripeness has two components: constitutional ripeness and prudential ripeness."  *In re Coleman*,

16  560 F.3d 1000, 1004 (9th Cir. 2009) (citation omitted).

17      Constitutional ripeness "is synonymous with the injury-in-fact prong of the standing

18  inquiry," *Paxton*, 56 F.4th at 1173, and has been characterized as "standing on a timeline" given

19  the primarily temporal focus of the inquiry.  *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d

20  1134, 1138 (9th Cir. 2000); *see also Lee v. State of Or.*, 107 F.3d 1382, 1387 (9th Cir. 1997)

21  ("While standing is primarily concerned with *who* is a proper party to litigate a particular matter,

22  ripeness addresses *when* that litigation may occur.").  Whether framed as an issue of standing or

23  ripeness, the case or controversy requirement of Article III mandates that a plaintiff's injury must

24  be "definite and concrete, not hypothetical or abstract."  *Thomas*, 220 F.3d at 1139 (quoting *Ry.*

25  *Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)).  "Where a dispute hangs on future contingencies

26  that may or may not occur, it may be too impermissibly speculative to present a justiciable

27  controversy."  *In re Coleman*, 560 F.3d at 1005 (citations and internal quotation marks omitted).

28

1   While many of WGA and Olive Hill's claims emphasize harms they assert may occur

2   through the imposition of an MMC-produced collective bargaining agreement, the issues

3   presented in this facial challenge are not all the type of "imaginary" or "speculative" abstractions

4   that run the risk of premature adjudication.  *See Thomas*, 220 F.3d at 1139.  For example, they

5   allege that "[e]ven before the inevitable imposition of a MMC contract, Olive Hill has suffered,

6   and continues to suffer, from being thrust into an unconstitutional process." (Doc. 1 at ¶ 74.)  The

7   "here-and-now" of that injury, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212

8   (2020), is Olive Hill's "claim . . . [of] *subjection* to an illegitimate proceeding, led by an

9   illegitimate decisionmaker," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023)

10  (emphasis added).  To the extent other down-the-line aspects of MMC may later be reviewed, that

11  subsequent review comes too late to address the alleged injury of being subjected to the MMC

12  process in the first place.  *See id.* ("A proceeding that has already happened cannot be undone.").

13  The Supreme Court in *Axon* took care to emphasize that the problem "stemming from the

14  interaction between the alleged injury and the timing of review" was addressed by "the nature of

15  the claims and accompanying harms" asserted.  *Id.* at 191–92.  Here, as in *Axon*, WGA and Olive

16  Hill "will lose their rights not to undergo the complained-of [MMC] proceedings if they cannot

17  assert those rights until the proceedings are over."[8]  *Id.* at 192.

18  The ALRB defendants argue that "[t]he MMC referral itself forces nothing on Olive Hill

19  or other employers and requires nothing of them," but this position ignores that a party's failure to

20  participate in MMC has consequences: for example, if Olive Hill declined to participate in

21  selecting a mediator, its contractual counterparty would be permitted to make that choice.  Cal.

22  Lab. Code § 1164(b).  Similarly, "[t]he failure of any party to participate or cooperate in the

23

---

24  [8]  An association like WGA has standing to bring suit on behalf of its members "when: (a) its
    members would otherwise have standing to sue in their own right; (b) the interests it seeks to

25  protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief
    requested requires the participation of individual members in the lawsuit."  *Ass'n for Accessible*

26  *Medicines v. Bonta*, 562 F. Supp. 3d 973, 981 (E.D. Cal. 2021) (quoting *Hunt v. Washington*
    *State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  The Court concludes, and the parties do

27  not dispute, that in this facial constitutional challenge to the MMC process WGA meets the
    requirements for associational standing.

28

1    mediation and conciliation process shall not prevent the mediator from filing a report with the

2    Board that resolves all issues and establishes the final terms of a collective bargaining agreement,

3    based on the presentation of the other party." Cal. Code Regs. tit. 8, § 20407(a)(1). In addition,

4    the ALRA provides that "[i]t shall be an unfair labor practice for an agricultural employer to . . .

5    refuse to bargain collectively in good faith." Cal. Lab. Code § 1153(e). "A lack of good faith"

6    may be found where there is "conduct clearly showing an intent not to enter into a contract of any

7    nature," *Gerawan Farming, Inc. v. Agric. Lab. Rels. Bd.*, 52 Cal. App. 5th 141, 179 (2020)

8    (citation and internal quotation marks omitted). Given these potential consequences, the ALRB

9    defendants' suggestion that Olive Hill would face no legal detriment for refusing to participate in

10   MMC is not persuasive. For these reasons, constitutional ripeness is satisfied.

11          Under the prudential ripeness test, courts consider "the fitness of the issues for judicial

12   decision and the hardship to the parties of withholding court consideration." *Labrador*, 122 F.4th

13   at 840 (quoting *Thomas*, 220 F.3d at 1141). Under the first prong, "pure legal questions that

14   require little factual development are more likely to be ripe." *Id.* (citation omitted); *see also*

15   *Stavrianoudakis v. United States Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024) ("A

16   claim is fit for decision if the issues raised are primarily legal, do not require further factual

17   development, and the challenged action is final."). In cases against a government agency,

18   relevant considerations include "whether the administrative action is a definitive statement of an

19   agency's position; whether the action has a direct and immediate effect on the complaining

20   parties; whether the action has the status of law; and whether the action requires immediate

21   compliance with its terms." *Stavrianoudakis*, 108 F.4th at 1139 (quoting *Stormans, Inc. v.

22   Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).

23          In this case, WGA and Olive Hill's facial challenge to the MMC provisions present purely

24   legal questions. Unlike an as-applied challenge, determining whether certain aspects of MMC

25   violate due process or equal protection does not require additional factual development of the

26   record. *C.f. Thomas*, 220 F.3d at 1141 (finding First Amendment challenge unfit for judicial

27   resolution in the absence of a concrete factual scenario demonstrating how the laws, *as applied*,

28   infringed on plaintiffs' constitutional rights.). Moreover, cases have been deemed prudentially

1    ripe even from "admittedly sparse" records where the challenged circumstances were "not

2    hypothetical." *See Stavrianoudakis*, 108 F.4th at 1139 (falconers applying for annual licenses

3    required to agree to submit to warrantless unannounced inspections). Here, there exists more than

4    a hypothetical challenge as Olive Hill's participation in MMC is ongoing. Although a collective

5    bargaining agreement has yet to be imposed, the ALRB's order directing Olive Hill to MMC is in

6    effect. The MMC provisions codified in the California Labor Code carry the force of law and as

7    such have a direct and immediate effect on Olive Hill by compelling it to participate in the

8    process or face practical consequences, as outlined above.

9        "Hardship serves as a counterbalance to any interest the judiciary has in delaying

10    consideration of a case." *Skyline Wesleyan Church v. California Dep't of Managed Health Care*,

11    968 F.3d 738, 753 (9th Cir. 2020) (quoting *Oklevueha Native Am. Church of Hawaii, Inc. v.

12    Holder*, 676 F.3d 829, 838 (9th Cir. 2012)). As the issues here are fit for judicial decision and

13    any hardship considerations in general weigh against the ALRB defendants, the second prong of

14    the prudential ripeness inquiry need not be further addressed. *Id.*

15    **B.    Likelihood of Success on the Merits**

16        As noted, the first *Winter* factor "is the most important (and usually decisive) one in cases

17    where a plaintiff brings a constitutional claim." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir.

18    2023). But "[p]laintiffs' litigation strategy impacts the likelihood of success inquiry." *Simon v.

19    City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025). In a facial challenge, as is

20    asserted here, the plaintiff "must show that the [law] is unconstitutional in every conceivable

21    application." *Id.* (cleaned up). This is the most difficult type of challenge to mount successfully.

22    *Id.*

23        1.    Due Process Claims

24        WGA and Olive Hill assert that various aspects of the MMC provisions violate the Due

25    Process Clause of the Fourteenth Amendment by impermissibly infringing on the liberty and

26    property interests of both agricultural employers and farm workers. For the reasons explained

27    below, WGA and Olive Hill's arguments are not persuasive.

28

13

1                   *a.*        *Compulsory Arbitration Scheme*

2           In arguing that MMC, as a form of compulsory interest arbitration, is unconstitutional,

3    WGA and Olive Hill rely heavily on *Charles Wolff Packing Co. v. Ct. of Indus. Rels. of State of*

4    *Kansas* (*Wolff I*), 262 U.S. 522 (1923), *Dorchy v. State of Kansas*, 264 U.S. 286 (1924), and

5    *Charles Wolff Packing Co. v. Ct. of Indus. Rels. of Kansas* (*Wolff II*), 267 U.S. 552 (1925).  This

6    trilogy of Supreme Court cases found invalid a Kansas statute authorizing a system of

7    compulsory arbitration for workers in a slaughtering and packing plant.

8           The statute at issue in the *Wolff* trilogy created an administrative agency to settle disputes

9    about wages and work hours through binding orders.  *Wolff II*, 267 U.S. at 559.  The orders were

10   binding on the employer and employees "even to the point of preventing them from agreeing on

11   any change in the terms fixed therein, unless the agency approves." *Id.* at 565.  The statute

12   permitted the agency to compel certain businesses to continue their operations on terms fixed by

13   the agency and prohibited an employee from "agree[ing] with his fellows to quit or combine with

14   others to induce them to quit." *Wolff I*, 262 U.S. at 534.  In finding the statute unconstitutional,

15   the Supreme Court reasoned that:

16
17          [t]he system of compulsory arbitration which the act establishes is
            intended to compel, and if sustained will compel, the owner and
            employees to continue the business on terms which are not of their
            making.  It will constrain them, not merely to respect the terms if
18          they continue the business, but will constrain them to continue the
            business on those terms.  True, the terms have some qualifications,
19          but as shown in the prior decision the qualifications are rather
            illusory and do not subtract much from the duty imposed.  Such a
20          system infringes the liberty of contract and rights of property
            guaranteed by the due process of law clause of the Fourteenth
21          Amendment.

22   *Wolff II*, 267 U.S. at 569.

23          The Supreme Court in *Wolf II* also recounted that in *Wolf I*,

24          [v]arious matters which were relied on as justifying the attempted
            restraint or abridgment were considered and pronounced inadequate.
25          Among them was the assumption in the act that a business like that
            in question—preparing food for sale and human consumption—is so
26          far affected with a public interest that the state may compel its
            continuance, and, if the owner and employees cannot agree, may fix
27          the terms through a public agency to the end that there shall be
            continuity of operation and production. This assumption was held to
28          be without any sound basis.

1   *Id.* at 566–67.  The constraints imposed by the Kansas statute were explained to be justified in

2   certain situations "somewhat equivalent to the appointment of officers and the enlistment of

3   soldiers and sailors in military service."  *Wolff I*, 262 U.S. at 541.  But as to the slaughtering and

4   packing plant in *Wolff*, "the state [was] without power to compel the owner and employees to

5   continue" operations.  *Wolff II*, 267 U.S. at 568.

6         *Wolff I* cited *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525 (1923), in finding that

7   the Kansas statute impermissibly "curtail[ed] the right of the employer on the one hand, and of

8   the employee on the other, to contract about his affairs."  *Wolff I*, 262 U.S. at 534.  More

9   specifically, it cited *Adkins* for the proposition that "legislative authority to abridge [individuals'

10  due process liberty interest in freedom of contract] can be justified only by exceptional

11  circumstances."  *Id.*

12        But *Adkins* was overruled by *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937).  As

13  the Supreme Court later explained:

> The doctrine that prevailed in Lochner, Coppage, Adkins, Burns, and
> like cases—that due process authorizes courts to hold laws
> unconstitutional when they believe the legislature has acted
> unwisely—has long since been discarded.  We have returned to the
> original constitutional proposition that courts do not substitute their
> social and economic beliefs for the judgment of legislative bodies,
> who are elected to pass laws.

18  *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963).  Social and economic "regulation which is

19  reasonable in relation to its subject and is adopted in the interests of the community is [consistent

20  with] due process."  *W. Coast Hotel Co.*, 300 U.S. at 391.  Other aspects of the *Wolff* decisions—

21  such as the reliance on a distinction between businesses according to whether they were "clothed

22  with a public interest" and the assumption that the due process clause forbade legislation to fix

23  hours and wages—have likewise been recognized as based on a long rejected *Lochner*-era

24  framework.  *See Lincoln Fed. Lab. Union No. 19129, A.F. of L. v. Nw. Iron & Metal Co.*,

25  335 U.S. 525, 536 (1949).[9]  California courts have also found arguments based on the *Wolff* cases

---

[9]  *Lincoln* noted that the "clothed with a public interest" distinction was rejected in *Nebbia v. People of New York*, 291 U.S. 502 (1934).  In that case, which considered whether the State of New York could fix the selling price of milk, the Court discussed how the private right to contract is not absolute, but rather must yield to the public need, subject to the guaranty of due process.

1    to be unpersuasive in similar due process challenges to the MMC statute.  *Gerawan Farming, Inc.*

2    *v. Agric. Lab. Rels. Bd.*, 3 Cal. 5th 1118, 1139 (2017) (explaining that the precedent relied on in

3    *Wolff* was "completely repudiated"); *Hess Collection Winery v. Agric. Lab. Rels. Bd.*, 140 Cal.

4    App. 4th 1584, 1598–99 (2006) ("The trouble with these decisions as precedent is that they were

5    rendered during the bygone era of substantive due process.").

6           The *Wolff* cases are also distinguishable because the provisions of the Kansas statute with

7    which they took issue are not present in the MMC statutory scheme.  Unlike the Kansas statute,

8    the MMC provisions do not prevent an employer and union from modifying their contract,

9    prohibit employers from ceasing operations, or prohibit employees from collectively quitting.

10   The Kansas statute imposed far more sweeping and intrusive controls on wages and working

11   conditions than the targeted dispute resolution framework in the MMC provisions.

12          Because the MMC regulates the economic relationship between agricultural employees

13   and employers, it is subject to rational basis review.  "The proper test for judging the

14   constitutionality of statutes regulating economic activity is whether the legislation bears a rational

15   relationship to a legitimate state interest."  *Slidewaters LLC v. Washington State Dep't of Lab. &*

16   *Indus.*, 4 F.4th 747, 758 (9th Cir. 2021).  Under this standard, WGA and Olive Hill must show

17   that MMC is "clearly arbitrary and unreasonable, having no substantial relation to the public

18   health, safety, morals or general welfare."  *Id.*  The California Supreme Court conducted a

19   persuasive rational basis review of the MMC provisions, recognizing that "the Legislature

20   reasonably could have concluded that a mediation process followed by binding arbitration in the

21   event of a bargaining impasse would 'correct' the ALRA's failure [to promote collective

22   bargaining agreements] and facilitate the adoption of first contracts."  *Gerawan*, 3 Cal. 5th at

23   1141.  "The Legislature also reasonably could have believed that facilitating first contracts

24   furthers the goal of 'ensuring stability' in the agricultural industry."  *Id.*  These observations are

25   supported by the legislative history and are well-reasoned and sound.

26   _____

27   *Nebbia*, 291 U.S. at 523–26.  It also recognized that "statutes prescribing the terms upon which
     those conducting certain businesses may contract, or imposing terms if they do enter into
28   agreements, are within the state's competency."  *Id.* at 528.

1    Accordingly, WGA and Olive Hill fail to demonstrate a likelihood of success or serious

2    questions going to the merits on this claim.

3            *b.    Lack of Adequate Safeguards*

4    Next, WGA and Olive Hill rely on public utility ratemaking and rent control cases in

5    arguing that the MMC provisions violate procedural due process because they fail to include an

6    exit mechanism or safeguard to ensure a reasonable rate of return:  "By long standing usage in the

7    field of rate regulation the 'lowest reasonable rate' is one which is not confiscatory in the

8    constitutional sense."  *Fed. Power Comm'n v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575, 585

9    (1942).  "[W]hether a regulation of prices is reasonable or [unconstitutionally] confiscatory

10    depends ultimately on the result reached."  *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 165

11    (1976) (citing *Fed. Power Comm'n*, 315 U.S. at 585–86).

12    WGA and Olive Hill's argument is dubious because the MMC provisions apply to private

13    agricultural employment, not public utility ratemaking, and they do not set any caps like a rent

14    control scheme.  WGA and Olive Hill cite no case requiring states to guarantee a particular rate of

15    return in the context of private labor relations.  *See S. California Healthcare Sys., Inc. v. City of*

16    *Culver City*, No. 221CV05052MCSRAO, 2022 WL 1394751, at *9 (C.D. Cal. Jan. 19, 2022)

17    (rejecting similar claim that wage ordinance did not provide sufficient guarantee of a "reasonable

18    return" for employers because the claim "relies on . . . inapposite state insurance and rent control

19    cases"), *aff'd*, No. 22-55166, 2023 WL 234787 (9th Cir. Jan. 18, 2023).  Plaintiffs cite *J.I. Case*

20    *Co. v. NLRB*, 321 U.S. 332 (1944), for the proposition that a collective bargaining agreement

21    "may be likened to the tariffs established by a carrier, to standard provisions prescribed by

22    supervising authorities for insurance policies, or to utility schedules of rates and rules for

23    service," but that case concerned an employer's refusal to bargain and did not mention rates of

24    return.  WGA and Olive Hill fail to identify convincing support for their novel position.

25    In any event, the MMC statute provides protections against confiscatory regulation by

26    directing the mediator to consider "[t]he financial condition of the employer and its ability to

27    meet the costs of the contract in those instances where the employer claims an inability to meet

28    the union's wage and benefit demands."  Cal. Lab. Code § 1164 (e)(2).  As the UFW persuasively

17

1    argues, if an employer believes its financial circumstances justify lower wages or benefits—or

2    adjustments tied to market crop prices—it can present that argument to the mediator and the

3    ALRB.  Furthermore, the MMC process includes notice, mediation, and a two-tiered system of

4    review, which collectively provides a sufficient procedural framework to satisfy due process

5    requirements.  WGA and Olive Hill have not shown that the absence of an exit mechanism or a

6    guaranteed rate of return renders the MMC statute invalid under rational basis review.

7        For these reasons, WGA and Olive Hill have not demonstrated a likelihood of success or

8    serious questions going to the merits on this claim.

9            *c.*    *Unlawful Delegation*

10        On this claim, WGA and Olive Hill contend that MMC unconstitutionally delegates

11   legislative authority by (1) allowing a "self-interested union," (2) to compel agricultural

12   employers into collective bargaining agreements without imposing adequate standards or

13   limitations to guide the exercise of that delegated power, and (3) with the union's decision

14   effectively final and unreviewable.  Their argument disregards that *either* the employer or the

15   union may request the initiation of the MMC process, and that the ALRB determines whether the

16   requirements are met.  Moreover, final decisions resulting from that process are made by the

17   mediator, not the union, and are subject to procedural review safeguards.

18        Rejecting a similar delegation challenge to the MMC provisions, the California Supreme

19   Court found that the mediator's authority under MMC is guided by statutory criteria and is

20   subject to appropriate oversight.  *Gerawan Farming, Inc. v. Agric. Lab. Rels. Bd.*, 3 Cal. 5th

21   1118, 1148–49, 1151 (2017) (finding that the nonexclusive list of factors in Cal. Lab. Code §

22   1164(e) provided sufficient legislative direction to mediators and that procedural safeguards,

23   including two-tiered review, were constitutionally adequate).

24        WGA and Olive Hill rely on *Douglas v. Noble*, 261 U.S. 165 (1923), but that case reflects

25   that the Court looked to the state's analysis of its statute in determining whether sufficient

26   legislative direction was given to the decision-maker.  In *Douglas*, the Court addressed the

27   constitutionality of a Washington state law requiring individuals to obtain a license to practice

28   dentistry.  *Douglas*, 261 U.S. 165, 166 (1923).  The law vested the licensing authority in a board

18

1   of practicing dentists, which was responsible for determining the qualifications necessary to

2   practice and for administering examinations to applicants. *Id.* The Court recognized that if the

3   challenged statute "purported to confer arbitrary discretion to withhold a license, or to impose

4   conditions which have no relation to the applicant's qualifications to practice dentistry, the statute

5   would, of course, violate the due process clause of the Fourteenth Amendment." *Id.* at 168. The

6   dental board's delegation of authority was constitutional, the Court found, because the state

7   legislature had established clear standards for licensure, including moral character and

8   educational requirements. *Id.* at 169. The scope of discretion "granted to the examining board

9   was well within" constitutional limits because "determin[ing] the subjects of which one must

10  have knowledge in order to be fit to practice dentistry, the extent of knowledge in each subject,

11  the degree of skill requisite, and the procedure to be followed in conducting the examination"

12  were appropriately committed to the board—which consisted of practicing dentists. *Id.* at 169–

13  70. In passing on the issues, the Court "follow[ed] applicable decisions of the highest court of the

14  state." *Id.* at 168. Here, as reflected in the California Supreme Court's interpretation of the

15  statute, the MMC provisions provide sufficient legislative direction to mediators. *Gerawan*, 3

16  Cal. 5th at 1148–49; Cal. Lab. Code § 1164(e).

17        WGA and Olive Hill's characterization of MMC as allowing the *union* to compel an

18  agricultural employer to mediation is not accurate because "[e]ven if unions are more likely to

19  demand MMC than employers, the Legislature empowered the *Board*, not the parties, to assess

20  whether the statutory prerequisites are met before it orders MMC." *Gerawan*, 3 Cal. 5th at 1142.

21  While WGA and Olive Hill argue that the ALRB's order directing parties to MMC is ministerial

22  or simply rubberstamps the union's request, the ALRB considers whether regulatory and statutory

23  requirements have been satisfied before ordering the parties to MMC, *see* Cal. Lab. Code

24  § 1164(b), as WGA and Olive Hill concede. Whether the ALRB orders MMC in response to a

25  request by an employer or a union depends on the ALRB's determination as to whether the

26  requirements for MMC are met. WGA and Olive Hill's argument that the referral process is

27  simply a "rubberstamp" for unions is meritless. Moreover, judicial review of a final ALRB order

28  under Cal. Lab. Code § 1164.5(a) is made "on the basis of the entire record," and could

19

1   presumably include any claim of an improper initiation of the MMC process by the ALRB.

2          WGA and Olive Hill have failed to establish that the MMC statute is unconstitutional in

3   all its applications.  *See Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir.

4   2025) (noting plaintiffs "must show that the [law] is unconstitutional in every conceivable

5   application" in a facial challenge).  Moreover, the criteria for referral that the California

6   Legislature selected can be seen as a rational choice to promote the legitimate interests of dispute

7   resolution and achievement of first contracts between agricultural employers and unions.  The

8   prospect of such interest arbitration incentivizes both parties to bargain in good faith and reach

9   voluntary agreements, while also providing a backstop to ensure that the agricultural sector is not

10  undermined by a widespread failure to reach labor agreements.  *See* Cal. Stats. 2002, ch. 1145,

11  § 1 (S.B. 1156) (recognizing a need for MMC "to ensure a more effective collective bargaining

12  process between agricultural employers and agricultural employees, and thereby more fully attain

13  the purposes of the [ALRA], ameliorate the working conditions and economic standing of

14  agricultural employees, create stability in the agricultural labor force, and promote California's

15  economic well-being by ensuring stability in its most vital industry.").

16         Accordingly, WGA and Olive Hill have not established a likelihood of success or serious

17  questions going to the merits on this claim.

18                 *d.*      *Role of the Mediator*

19         Because the mediator may preside over both "off-the-record" and "on-the-record" parts of

20  the MMC process, WGA and Olive Hill speculate that a mediator might impermissibly rely on

21  off-the-record proceedings in crafting his or her report to the ALRB.  This argument is

22  unpersuasive because it is an entirely hypothetical argument as to what might occur in a specific

23  MMC proceeding and cannot support a facial challenge to the MMC statute.  This argument has

24  also already been considered and rejected by the California Supreme Court:

25                 Gerawan argues that the MMC statute's judicial review is
                   additionally ineffective because a court would be unable "to assess
26                 whether ex parte or 'off-the-record' communications 'decisively
                   influenced' the mediator's decisions."  But as the Board explains,
27                 ALRB regulations require the mediator to cite evidence in the record
                   to support his or her final report and prohibit the mediator from
28                 basing any findings or conclusions on "off the record"

1
2
3
4

> communications.  (Cal. Code Regs., tit. 8, § 20407, subd. (a)(2).)
> Further, the regulations allow a party to file with the Board
> "declarations that describe pertinent events that took place off the
> record" in case of any alleged misconduct or improper factfinding.
> (*Id.*, § 20408, subd. (a).)  Gerawan did not do so here.  The ALRB
> regulations provide additional safeguards against unfairness or
> favoritism.

5    *Gerawan*, 3 Cal. 5th at 1152.

6

7    Facial challenges are limited to the text of the statute, not how it may be applied in a

8    particular case.  *See, e.g.*, *Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172,

9    1176 (9th Cir. 2020) ("As this is a facial challenge, we consider only the text of the zoning

10   ordinance, not its application.").  The arguments WGA and Olive Hill advance regarding what a

11   mediator *might* rely on are unpersuasive in this context, and even more so to the extent they have

12   been addressed by a unanimous California Supreme Court, which concluded that "the Legislature

13   resolved the fundamental policy issues and provided sufficient guidance and procedural

14   safeguards in the MMC statute" to survive a constitutional challenge.  *Gerawan*, 3 Cal. 5th at

15   1152.

16   Thus, WGA and Olive Hill fail to demonstrate a likelihood of success or serious questions

17   going to the merits on this claim.

18            e.    *Requirement of Parties to Pay MMC Mediation Costs*

19   Finally, WGA and Olive Hill contend that MMC's imposed cost-shifting conflicts with

20   controlling constitutional principles and is invalid on its face.  This barebones argument rests

21   entirely on the California Supreme Court's decision in *California Teachers Ass'n v. State of

22   California*, 20 Cal. 4th 327, 332 (1999).  In that case, the State was obligated by the Due Process

23   Clause to provide public school teachers with a hearing, upon a teacher's request, before

24   terminating or suspending their employment.  20 Cal. 4th 327, at 335–36.  The challenged statute

25   required that a teacher who exercised their constitutional right to request a hearing had to pay half

26   of the hearing costs, including the cost of the administrative law judge, if the teacher did not

27   prevail—even if the teacher's arguments were not frivolous.  *Id.* at 331.  The California Supreme

28   Court held the cost requirement was unconstitutional because it "ha[d] no purpose other than to

21

1    chill the exercise of the right of teachers to demand a hearing before they are dismissed or

2    suspended" and in effect "invariably will chill the exercise of the right of teachers to a hearing."

3    *Id.* at 338.

4         WGA and Olive Hill's argument on this basis is unpersuasive because the purpose of the

5    cost sharing provision at issue in *California Teachers Ass'n* was to deter individual teachers from

6    exercising their right to a hearing challenging their termination.  *Id.* at 345.  In contrast, there is

7    no indication of any improper purpose for the cost-sharing requirement under the MMC.  The

8    statute provides that "[t]he costs of mediation and conciliation shall be borne equally by the

9    parties."  Cal. Labor Code § 1164(b).  The MMC process is specifically designed to provide both

10   employers and unions with an accessible mechanism for resolving bargaining impasses, ensuring

11   that the parties have a meaningful opportunity to present their positions.  It was not irrational for

12   the State to determine that employers and unions should share the costs of such proceedings.

13        Therefore, WGA and Olive Hill have not established a likelihood of success or serious

14   questions going to the merits on this claim.

15             2.      Equal Protection Claim

16        WGA and Olive Hill argue that the MMC statute violates equal protection because the

17   statute permits a union to decide whether to request referral to MMC for a particular employer,

18   and because, if a contract is imposed through the MMC process, each employer is subject to a

19   different individualized contract.

20        Under the Equal Protection Clause of the Fourteenth Amendment "[n]o State shall . . .

21   deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend.

22   XIV.  That language "is essentially a direction that all persons similarly situated should be treated

23   alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

24        "In areas of social and economic policy, a statutory classification that neither proceeds

25   along suspect lines nor infringes fundamental constitutional rights must be upheld against equal

26   protection challenge if there is any reasonably conceivable state of facts that could provide a

27   rational basis for the classification."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313

28   (1993).  "Where there are plausible reasons for [legislative] action, our inquiry is at an end."  *RUI*

1  *One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004) (cleaned up).  "It is 'entirely

2  irrelevant for constitutional purposes' whether the proffered rational basis was the actual

3  motivation for the law, and 'the absence of legislative facts explaining the distinction on the

4  record has no significance in rational-basis analysis.'"  *W. Growers Ass'n v. City of Coachella*,

5  548 F. Supp. 3d 948, 962 (C.D. Cal. 2021) (quoting *Beach Communications*, 508 U.S. at 315).

6      Applying rational basis review to an equal protection challenge to the MMC statute, the

7  California Supreme Court in *Gerawan* rejected substantially the same arguments raised here –

8  that the statute treats similarly situated agricultural employers differently because not all

9  employers may end up subject to MMC, and that each MMC-produced collective bargaining

10  agreement is unconstitutionally arbitrary due to the discretion of the mediator.  *Gerawan*, 3 Cal.

11  5th at 1141–44.  The court explained:

> The purpose of the MMC statute is to promote collective bargaining and ensure stability in the agricultural labor force.  (Stats. 2002, ch. 1145, § 1, p. 7401.)  The statute accomplishes its purposes by empowering mediators to make individualized determinations regarding the terms of particular collective bargaining agreements. These individualized determinations are rationally related to the Legislature's legitimate interest in ensuring that collective bargaining agreements are tailored to the unique circumstances of each employer. As the Board explains, "[c]ontract terms appropriate for a 25–employee family farm may make little sense at a 5,000–employee agricultural corporation, and reasonable wages and benefits will necessarily vary across company size, crop, and geographic region."

19  *Id.* at 1144.

20      The State has a rational basis to apply the MMC process to situations involving a first

21  contract, where a union has been certified but the employer and union have not timely reached an

22  agreement after an initial request to bargain.[10]  And, as *Gerawan* found, the fact that collective

23  bargaining agreements resulting from the MMC process are individualized is rational:  "these

24  individualized determinations are rationally related to the Legislature's legitimate interest in

[10]  In *New York State Vegetable Growers Ass'n, Inc. v. James*, the court rejected an equal protection challenge to a compulsory impasse arbitration scheme, similar to MMC, codified in the New York State Employment Relations Act.  No. 23-CV-1044 (JLS), 2024 WL 1161115, at *6 (W.D.N.Y. Feb. 21, 2024), *aff'd*, No. 24-525-CV, 2025 WL 547915 (2d Cir. Feb. 19, 2025).

23

1    ensuring that collective bargaining agreements are tailored to the unique circumstances of each

2    employer." *Id.* at 1144. This classification bears "a strong presumption of validity," and WGA

3    and Olive Hill have not met their burden "to negat[e] every conceivable basis which might

4    support it." *Beach Communications*, 508 U.S. at 314.

5          Accordingly, WGA and Olive Hill have not established a likelihood of success or serious

6    questions going to the merits of this claim.[11]

7          In the absence of serious questions going to the merits, the remaining *Winter* factors need

8    not be considered. *Roe v. Critchfield*, No. 23-2807, 2025 WL 1486985, at *4 (9th Cir. May 23,

9    2025) (citing *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

10    Nonetheless, the other factors are briefly discussed for completeness.

11    **C.    Irreparable Harm**

12          WGA and Olive Hill assert that they will be irreparably harmed in the absence of

13    injunctive relief because they will not be able to recover compliance costs incurred through

14    participating in MMC and through performance of the impending final collective bargaining

15    agreement. They cite to a concurring opinion in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200

16    (1994), for the proposition that "complying with a regulation later held invalid almost *always*

17    produces the irreparable harm of nonrecoverable compliance costs." *Id.* at 220–21 (Scalia, J.,

18    concurring). However, a "crucial difference" is that here, WGA and Olive Hill have "the option

19    of complying [with MMC] *and then* bringing a judicial challenge." *Id.* at 221. Even if WGA and

20    Olive Hill could not seek to recover compliance costs associated with *participating* in MMC, the

21    "risk[ of] 'enormous' and 'severe' penalties, effectively cut[ting] off all access to the courts" that

22    was contemplated by Justice Scalia in *Thunder Basin* is not present here. *Id.* Additionally,

23    plaintiffs may seek judicial review of the ALRB's final order and a stay of enforcement pending

24    judicial review. Cal. Lab. Code §§ 1164.5(a), 1164.3(f)(3). These statutory safeguards provide

25    WGA and Olive Hill with sufficient time to seek judicial review of an MMC-produced collective

26    bargaining agreement before being compelled to comply with its terms.

27

28

---

[11] The same is true with respect to the claim for declaratory and injunctive relief, as that claim is derivative of the underlying claims addressed above.

1    Accordingly, WGA and Olive Hill have not shown that they would suffer a likelihood of

2    irreparable harm in the absence of injunctive relief.

3    **D.    Balance of the Equities and Public Interest**

4    As to these final merged factors, WGA and Olive Hill's argument rests entirely on the

5    assumption that they have shown a likelihood of success or serious questions going to the merits

6    of their claims.  They have not.  "The public interest may be declared in the form of a statute."

7    *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008).

8    Here, the public interest in "a more effective collective bargaining process between agricultural

9    employers and agricultural employees" is established.  *Gerawan*, 3 Cal. 5th at 1132.  While "it

10   would not be equitable or in the public's interest to allow the state to violate the requirements of

11   federal law, especially when there are no adequate remedies available," *Arizona Dream Act Coal.*

12   *v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (citation and alteration omitted), as discussed

13   above WGA and Olive Hill have failed to establish that any of the MMC provisions are likely

14   unconstitutional.  *See also Gerawan*, 3 Cal. 5th at 1130 (holding "that the MMC statute neither

15   violates equal protection nor unconstitutionally delegates legislative power.").  Therefore, the

16   balance of the equities and public interest do not favor injunctive relief.

17                                              **CONCLUSION**

18   Accordingly, WGA and Olive Hill's motion for a preliminary injunction, (Doc. 13) is

19   denied.

20

21

22   IT IS SO ORDERED.

23   Dated:    July 1, 2025

                                              UNITED STATES DISTRICT JUDGE

24

25

26

27

28

25